BAGLIN, SUPERIOR GENERAL OF THE ORDER OF CARTHUSIAN MONKS, *v.* CUSENIER COMPANY.

APPEAL FROM AND ON CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 99.　Argued March 14, 15, 1911.—Decided May 29, 1911.

While names which are merely geographical cannot be exclusively appropriated as trade-marks, a geographical name which for a long period has referred exclusively to a product made at the place and not to the place itself may properly be used as a trade-mark; and so *held* that the word "Chartreuse" as used by the Carthusian Monks in connection with the liqueur manufactured by them at Grande Chartreuse, France, before their removal to Spain, was a validly registered trade-mark in this country.

The law of a foreign country has no extra-territorial effect to detach a trade-mark validly registered in this country from the product to which it is attached.

Non-user of a trade-mark, or the use of new devices, does not afford a basis for the penalty of loss of right thereto by abandonment; abandonment will not be inferred in the absence of intent, and a finding of intent must be supported by adequate facts.

While one may use the name of the place where he manufactures an article, in order to show where it is manufactured, and may state all the facts in regard to his succession, under the law of a foreign country, to property of parties formerly manufacturing an article similar in many respects, he cannot, in this country, use the name of the place to designate the article if that name has been validly registered as a trade-mark here; and so *held* that the liquidator appointed in France of the property of the Carthusian Monks could not, in this country, use the word "Chartreuse" to designate the liqueur manufactured by him at Grande Chartreuse, the Carthusian Monks having validly registered that name in the United States as a trade-mark of the liqueur manufactured by them.

A validly registered trade-mark cannot be used by anyone other than the owner, even with words explaining that the article to which it is attached is not manufactured by the owner of the trade-mark.

Where the Circuit Court has sustained the trade-mark but the Circuit Court of Appeals has suggested a form of label that the defendant might use, defendant should not be punished for contempt for using such a form.

THE facts, which involve the validity of the word "Chartreuse" as a trade-mark and other questions in regard to the ownership thereof and the sale of cordials under that name, are stated in the opinion.

*Mr. Philip Mauro,* with whom *Mr. C. A. L. Massie* and *Mr. Ralph L. Scott* were on the brief, for appellants and petitioners:

The office of a trade-mark is to guarantee the origin of an article with which it has become identified in the public mind. *Medicine Co.* v. *Wood,* 108 U. S. 218, 223.

Defendant's use of the "Chartreuse" trade-mark vio-

lates the fundamental law of trade-marks. Defendant's liqueur is of recent origin, its formula having been devised in 1904. Defendant's business is not a continuation of complainants' business.

. The French court at Grenoble has decided that the product sold by defendant is not genuine Chartreuse. There can be no dispute between the parties hereto as to the validity of the trade-mark "Chartreuse." That word does constitute a valid trade-mark as applied to liqueurs, cordials, etc. See *Falk* v. *Trading Co.*, 180 N. Y. 445, 451; *Grezier* v. *Girard*, decided April 13, 1876; *A. Bauer & Co.* v. *Order of Carthusian Monks*, 120 Fed. Rep. 78; and see also Judgment of the English House of Lords.

.The significance of the word "Chartreuse" is not geographical alone; but even if it were, geographical names may constitute lawful trade-names under some circumstances. *Wotherspoon* v. *Currie*, L. R. 5 H. L. 508; *Lawrence Co.* v. *Tenn. Mfg. Co.*, 138 U. S. 537, 550; *Scriven* v. *North*, 134 Fed. Rep. 366, 377; *Thompson* v. *Montgomery*, 41 Ch. D. 35, 50; "*Stone Ale*". Case, and *Reddaway* v. *Banham*, 1 Q. B. 286; "*Camel Hair Belting*" Case; *Shaver* v. *Heller & Merz Co.*, 108 Fed. Rep. 821; *Buzby* v. *Davis*, 150 Fed. Rep. 275; *Pillsbury* v. *Mills Co.*, 24 U. S. App. 395; *S. C.*, 12 C. C. A. 432, and 64 Fed. Rep. 841; *Kathreiner's Malzkaffee Fab.* v. *Pastor Kneipp Med. Co.*, 82 Fed. Rep. 321, 324; *Siegert* v. *Gandolfi*, 149 Fed. Rep. 100; *S. C.*, 79 C. C. A. 142; *Bauer* v. *Siegert*, 120 Fed. Rep. 81.

The property involved in this suit is the good-will of the business which has come into existence in this country, being the outgrowth of transactions, extending over many years, between complainants and the American public. It was one of the objects of the French law of 1901 to confiscate this American business, and even if such were one of the objects of that law said business is not subject to the jurisdiction of the French laws and tribunals.

For definition of "good-will" see. *Washburn* v.. *Wall Paper Co.*, 81 Fed. Rep. 17, 20.

The Monks owned the business in question during all the centuries they manufactured liqueurs in France, and had at any time the right to move their base of operations from one place to another. The right to transfer a business from place to place is an incident of ownership.

The attempt of the liquidator to exercise ownership over the foreign trade-marks has been disapproved by the French courts. The French law of 1901, and the decrees of the French courts give no color of authority to defendant to use the trade-marks of complainants in the United States.

The new labels employed by complainants do not in any way amount to an abandonment of the old trade-name and trade-marks.

*Mr. A. L. Pincoffs,* with whom *Mr. Roger Foster* was on the brief, for appellees and cross-petitioners:

The bill cannot be maintained as a bill to enjoin infringements by the complainant of a trade-mark, as the primary meaning of the word "Chartreuse" is geographical and no use of the word as its trade-mark by defendant is proved. *Elgin Co.* v. *Illinois Watch Co.,* 179 U. S. 665, 667; *Ex parte Farmer Co.,* 18 Off. Gaz. 412; *Pillsbury Co.* v. *Eagle Co.,* 86 Fed. Rep. 608; *Waltham Watch Co.* v. *U. S. Watch Co.,* 173 Massachusetts, 85; *Wolf* v. *Goulard,* 18 How. Pr. 64, 66, 67; *Lea* v. *Wolf,* 46 How. Pr. 157, 158; Browne on Trade-marks, 2d ed., § 182, p. 193; *Durham Smoking Tobacco Case,* 3 Hughes, 111, 167.

There was no business or good-will vested in complainants in this country separate and apart from the business and good-will in France. *Knoedler* v. *Boussod.* 47 Fed. Rep. 465.

The disputed marks and the phrase "Chartreuse," as applied to a liqueur, are primarily significant of place of

manufacture; the complainants have failed to prove that they have acquired a secondary meaning and refer merely to the fact that the article is of their manufacture. *Wotherspoon* v. *Currie*, L. R. 5 H. L. 508; *Thompson* v. *Montgomery*, L. R. 41 Ch. Div. 35; *Bauer* v. *Carthusian Monks*, 120 Fed. Rep. 78.

Complainants cannot maintain this suit, because the marks which they seek to enjoin defendant from using cannot be used by themselves. *Atlantic Milling Co.* v. *Robinson*, 20 Fed. Rep. 218; *Dixon Crucible Co.* v. *Guggenheim*, 3 Am. L. T. 228; *Hudson* v. *Osborne*, 39 L. J. Ch. (N. S.) 79; *Shipwright* v. *Clements*, 19 W. R. 599; *Hall* v. *Barrows*, 4 DeG., J. & S. 150; *Monson* v. *Boehm*, L. R. 26 Ch. Div. 398, 405.

Those who do not in any sense succeed to the business cannot claim the trade-mark. There is no such thing as a trade-mark in gross. It must be appendant to some particular business. *Weston* v. *Ketcham*, 51 How. Pr. 455; *Kidd* v. *Johnson*, 100 U. S. 617.

The complainants have failed to prove that this defendant falsely represents that the liqueur sold by it is made in accordance with any recipe of complainants, or that it is guilty of any misrepresentation in stating that its liqueur is identical with that formerly made by the Monks. *Hostetter* v. *Hungerford*, 97 Fed. Rep. 585.

As the product formerly manufactured by the Monks owed its reputation to its quality, due to certain advantages inseparably connected with the place of manufacture, defendant's principal, who, by decree of a competent French court, has been directed and authorized to carry on such business at the identical place under similar conditions, and who, owing to the advantages so enjoyed by him, has succeeded in making the identical article, has the right to the good-will attached to such business and to use the trade-name and labels connected with it.

Trade-marks or trade-names may be assigned with the

business to which they appertain, and will go with an assignment of the good-will of that business, either voluntarily or by operation of law. *Kidd* v. *Johnson*, 100 U. S. 617; *Menendez* v. *Holt*, 128 U. S. 514; *Chemical Co.* v. *Meyer*, 139 U. S. 547; *Warren* v. *Thread Co.*, 134 Massachusetts, 247; *Nervine Co.* v. *Richmond*, 159 U. S. 302.

The good-will of a business including the right to use trade-marks, even where these consist of the names of individuals engaged in the business, and of a picture representing such name, pass with a transfer of all the property and assets of the business, although not specifically mentioned. *Fish Bros. Wagon Co.* v. *Titus G. Fish et al.*, 82 Wisconsin, 546; *Sarrazin* v. *Irby Segar & Tobacco Co.*, 93 Fed. Rep. 624; *Nervine Co.* v. *Richmond*, 159 U. S. 293; *Peck Bros. & Co.* v. *Peck Bros.*, 113 Fed. Rep. 291; *Chemical Co.* v. *Meyer, supra; LePage Co.* v. *Russia Cement Co.*, 51 Fed. Rep. 941.

The correctness of the French judgments appointing defendant's principal are not open to question here. They are of the nature of a judgment *in rem.* Black on Judgments, 2d ed., § 79; *Windsor* v. *McVeigh*, 93 U. S. 274; *Kreiss* v. *Faron*, 118 California, 142; *Whitney* v. *Walsh*, 1 Cush. 29.

When a court of competent jurisdiction and by proceedings directed specifically against things within its jurisdiction, acts on such things, its judgment, if the procedure be regular, is everywhere binding. Wharton, Conflict of Laws, 3d ed., 665, 666; *Castrique* v. *Imrie*, L. R. 4 H. L. 428; *Magoun* v. *New Eng. Co.*, 1 Story, 157; *Peters* v. *Warren Ins. Co.*, 14 Pet. 99; *Hudson* v. *Guestier*, 4 Cranch, 293; *Williams* v. *Armroyd*, 7 Cranch, 423; *Whitney* v. *Walsh*, 1 Cush. 29; Black, Judgments, § 813; *Monroe* v. *Douglas*, 4 Sandf. Ch. 126, 183; *Hilton* v. *Guyot*, 159 U. S. 167.

This court cannot enter into an inquiry as to whether the French courts proceeded correctly as to their own law.

Black on Judgments, 581–9; *Castrique* v. *Imrie*, L. R. 4 H. L. 428; *Williams* v. *Armroyd*, 7 Cranch, 423.

Even if the word "Chartreuse" and the labels ever had the secondary meaning claimed by the complainants, the evidence in this case shows that they have lost such meaning, and that both the word "Chartreuse" and the labels indicate to the American public exclusively the article manufactured by the defendant's principal. *Hildreth* v. *McDonald*, 164 Massachusetts, 16; *Singer Co.* v. *Wilson*, 2 Ch. Div. 447; *Van Camp Co.* v. *Cruikshanks Co.*, 90 Fed. Rep. 814; *Von Muenser* v. *Wittenran*, 85 Fed. Rep. 966; *S. C.*, 91 Fed. Rep. 126.

The provisions of our trade-mark treaties and our own existing registration statute support defendant's contention here.

MR. JUSTICE HUGHES delivered the opinion of the court.

Père Baglin, Superior General of the Order of Carthusian Monks, for himself and the other members of the Order, brought this bill in equity against the Cusenier Company, a New York corporation, to restrain the infringement of trade-marks and unfair competition.

The complainant had a decree in the Circuit Court, and this was modified in certain particulars, to which we shall presently refer, by the Circuit Court of Appeals. The complainant then appealed to this court and motion was made to dismiss the appeal, it being urged that the decree below was not final. Complainant then petitioned for a writ of certiorari, and this writ and a cross-writ asked for by the respondent were granted.

The facts, so far as we deem it necessary to state them, are as follows: For several hundred years prior to 1903— save for a comparatively brief period following the French Revolution—the Order of Carthusian Monks occupied the Monastery of the Grande Chartreuse, near Voiron, in the Department of Isere, in France. This was their

Mother House. There, by a secret process, they made the liqueur or cordial which, at first sold locally, became upwards of fifty years ago the subject of an extensive trade and is known throughout the world as "Chartreuse." The Monks originally manufactured the liqueur at the Monastery itself and later at Fourvoirie, close by. It was marketed, here and abroad, in bottles of distinctive shape, to which were attached labels bearing the inscription, "Liqueur Fabriquée à la Gde. Chartreuse," with a facsimile of the signature of L. Garnier, a former Procureur of the Order, and its insignia, a globe, cross and seven stars; and these symbols with "Gde. Chartreuse" underneath were also ground into the glass. In 1876, the then Procureur registered two trade-marks in the Patent Office, and these were re-registered in 1884, under the act of 1881. In the accompanying statement the one was said to consist "of the word 'Chartreuse,' accompanied by a facsimile of the signature of L. Garnier," and the other "of the word-symbol 'Chartreuse;'" and the combinations in which these were used were described.

In the year 1903, having been refused authorization under the French law of July 1, 1901, known as the Associations Act, the congregation of the Chartreux was held to be dissolved by operation of law and possession was taken of their properties in France by a "sequestrating administrator and liquidator" appointed by the French court. Forcibly removed from their former establishment, and taking their secret with them, the Monks set up a factory at Tarragona, in Spain, and there according to their ancient process they have continued the manufacture of the liqueur, importing from France such herbs as were needed for the purpose.

The French liquidator, Henri Lecouturier, employing a skilled distiller and chemical assistants, undertook by experimentation to make at Fourvoirie a liqueur either identical with or resembling as closely as possible the

famous "Chartreuse;" and, having succeeded in this effort to his satisfaction, he placed his product upon the market under the old name. His agent in this country under date of October 25, 1904, issued a circular containing the following announcement:

"I take pleasure in informing you that I have been appointed Sole Agent for the United States and Canada for the Grande Chartreuse Liqueur. Within a few days I shall receive a shipment and therefore will be able to execute orders. As there is a very extensive demand for this cordial, I shall not be able to fill large orders in full, but I trust that, within a few weeks, I will have sufficient stock on hand to enable me to satisfy the demand through the Cusenier Company, whom I have appointed my distributing agents.

"Nothing has been changed in the putting up of the products of the Grande Chartreuse, which bear the same labels as heretofore, *the only guarantee of authenticity and of origin of the Chartreuse made at the Monastery.*"

The liquidator's cordial was shipped to this country, and sold here, in bottles of precisely the same description and with the same marks and symbols which had been used by the Monks; if there was any difference it is frankly stated to have been unintentional.

Meanwhile the Monks, debarred by the proceedings in France from the use of their old marks and symbols in that country, devised a new designation for their liqueur, in which prominence was given to the words "Pères Chartreux." The new label bore the inscription "Liqueur Fabriquée à Tarragone par les Pères Chartreux;" and this was accompanied by the statement that "this liqueur is the only one identically the same as that made at the Monastery of the Grande Chartreuse in France, previous to the expulsion of the Monks, who have kept intact the secret of its manufacture." To negative the claim of abandonment they made a small shipment to this country

under the old labels. And, both here and in other countries, the Monks have sought by legal proceedings to prevent the use of the word "Chartreuse" as a designation of the liqueur made at Fourvoirie since their expulsion, and the use or imitation by the liquidator or by those claiming under him of the marks which the Monks had associated with their product and the simulating in any way of the dress or packages in which it had been sold.

. For this purpose, this suit was brought against the defendant, who was then representing the liquidator in this country. Pending it, the liquidator sold the property he had acquired and the business he had been conducting in that capacity to a company known as the "Compagnie Fermière de la Grande Chartreuse," which has continued the manufacture of liqueur at Fourvoirie and also its sale in this country through the defendant as its representative.

On final hearing the Circuit Court adjudged "that the word-symbol 'Chartreuse,' as applied to liqueur or cordial," and that "the said word-symbol 'Chartreuse' accompanied by the facsimile signature of L. Garnier," as set forth in the certificates of registry in the Patent Office, "constitute good and valid trade-marks, and in this country have been and now are the sole and exclusive property of said complainants, the Carthusian Monks or Fathers (Pères Chartreux); and that in this country the said complainants still have the right, and the exclusive right, to use the said marks, or any of them, upon liqueurs or cordials manufactured by the complainants." It was further adjudged that the defendant had been guilty of infringement of these trade-marks and of unfair competition, and the decree also contained a perpetual injunction.

The Circuit Court of Appeals affirmed the decree with modifications which affect only the paragraph containing the injunction. This paragraph as amended reads as

follows (the words inserted by the Court of Appeals being
italicized):

"It is further adjudged, ordered and decreed that de-
fendant, its associates, successors, assigns, officers, serv-
ants, clerks, agents, and workmen, and each of them be,
and they hereby are perpetually enjoined from using in
this country or in any possession thereof, in connection
with any liqueur or cordial not manufactured by com-
plainants, the trade-mark 'Chartreuse,' or of any colorable
imitation thereof *unless so used as clearly to distinguish
such liqueur or cordial from the liqueur or cordial manu-
factured by the complainants*—or the fac-simile signature
of L. Garnier, or any colorable imitation thereof—or any
of the trade-marks above referred to, or any colorable
imitation thereof; and they and each of them are likewise
perpetually enjoined from importing or putting out or
selling or offering for sale, directly or indirectly, within
this country, any liqueur or cordial not manufactured by
complainants, in any dress or package like or simulating
in any material respects the dress or package heretofore
used by complainants—and in particular from making
use of any [bottle or] label or [package] *symbol* like or
substantially similar to *those appearing on* 'Complainants'
Exhibit, Defendant's Liqueur,' being the bottle now on
file as an exhibit in this Court—and from in anywise at-
tempting to make use of the good-will and reputation of
complainants in putting out in this country any liqueur
or cordial not made by complainants."

The defendant contends that the Circuit Court was
without jurisdiction. This objection must fail, as it suffi-
ciently appears from the record that the controversy was
between foreign subjects and a New York corporation.
And there was also an assertion by the bill of a right under
the Federal statute, by virtue of the registration of the
trade-mark.  *Warner* v. *Searle & Hereth Company,* 191
U. S. 195; *Standard Paint Company* v. *Trinidad Asphalt*

*Company*, 220 U. S. 446, decided April 10, 1911; *Jacobs* v. *Beecham*, decided May 15, 1911, *ante*, p. 263.

On the merits, the questions presented are (1) What rights, with respect to the designations· and marks involved, were enjoyed by the Carthusian Monks prior to their expulsion ·from the French Monastery; (2) What effect upon their rights had (*a*) the liquidation proceedings in France, and (*b*) the conduct of the Monks in relation to the trade in the liqueur which they subsequently made in Spain; and, in the light of the conclusions upon these points, (3) To what remedy, if any, are the Monks entitled?

It is insisted that the judgment is erroneous in determining that "the word-symbol Chartreuse" constituted a valid trade-mark. It is argued that "Chartreuse" is a regional name; that the characteristic qualities of the liqueur were due to certain local advantages by reason of the herbs found and cultivated within the. district described; that even as used in ·connection with the Monks' liqueur it was still a description of place; and hence, that at most, so far as this word is concerned, the question could be one only of unfair competition.

The validity of this argument cannot be admitted upon the facts which we deem to be established and controlling. It is undoubtedly true that names which are merely geographical cannot be the subject of exclusive appropriation as trade-marks. "Their nature is such that they cannot point to the origin (personal origin) or ownership of the articles of trade to which they may be applied. They point only at the place of production, not to the producer, and could they be appropriated exclusively, the appropriation would result in mischievous monopolies." *Canal Company* v. *Clark*, 13 Wall. p. 324. See also *Columbia Mill Company* v. *Alcorn*, 150 U. S. 460; *Elgin National Watch Company* v. *Illinois Watch Company*, 179 U. S. 665.

This familiar principle,· however, is not applicable here. It is not necessary for us to determine the origin of the

name of the Order and its chief Monastery. If it be assumed that the Monks took their name from the region in France in which they settled in the Eleventh Century, it still remains true that it became peculiarly their designation. And the word "Chartreuse" as applied to the liqueur which for generations they made and sold cannot be regarded in a proper sense as a geographical name. It had exclusive reference to the fact that it was the liqueur made by the Carthusian Monks at their Monastery. So far as it embraced the notion of place, the description was not of a district, but of the Monastery of the Order—the abode of the Monks—and the term in its entirety pointed to production by the Monks.

It cannot be supposed that if, during the occupation by the Monks of the Monastery of La Grande Chartreuse, another had established a factory at Fourvoirie and there manufactured a liqueur, he could have affixed to it the name "Chartreuse" or "Grande Chartreuse" or "Gde. Chartreuse" on the ground that these were place names or descriptive of advantages pertaining to the locality. It could not fail to be recognized at once that these were the distinctive designations of the liqueur made by the Monks and not geographical descriptions available to any one who might make cordial in a given section of country. The same would have been true if the Monks had voluntarily removed and continued their manufacture elsewhere. As was forcibly said by the Lord Chief Justice in the Court of Appeal in *Rey* v. *Lecouturier*, [1908] 2 Ch. 715, p. 726: "To test this question, let us suppose that the monks had moved their manufacture to another monastery or another building in France and had sold the fabric of the distillery and left the district of La Grande Chartreuse but had continued to make the liqueur in the same way could it be contended that any one who bought as old bricks and mortar the distillery at Fourvoirie could immediately call any liqueur made there by the name of

Chartreuse, and put it on the English market under that name? It is to me quite unarguable."

The claim of the Monks to an exclusive right in this designation as applied to the liqueur has been frequently the subject of litigation and has repeatedly been sustained. In 1872, *La Cour de Cassation* in *Le Père Louis Garnier* v. *Paul Garnier*, 17 Annales, p. 259, held that "the word Chartreuse, applied as a denomination to the liqueur made by the religious community of which Père Garnier is the representative, is but an abbreviation and the equivalent of a designation more complete; for it at once indicates *the name of the fabricants* (the Chartreux); *the name or commercial firm of manufacture*, which is no other than the community of these same Chartreux, and finally *the place of manufacture*, that is to say the monastery of La Grande Chartreuse." It was concluded that the designation was the exclusive property of the Monks. Mr. Browne, after quoting the above passage, adds: "That single word" (Chartreuse) "contains a long history of strife. It has repeatedly been held to be a perfect trade-mark, for the reasons just cited." Browne on Trade-marks, § 582; §§ 407–410. See also 17 Annales, 241, 249; *Rey* v. *Lecouturier, supra*, p. 726; *Grezier* v. *Girard*, and others, United States Circuit Court, Southern District of New York, 1876, not reported; *A. Bauer* v. *Order of Carthusian Monks*, 120 Fed. Rep. 78.

We find no error, therefore, in this determination of the judgment. The registered trade-marks were valid. In the statements for registration, the symbols actually used in combination were set forth. Take, for example, the mark in the glass of the bottle, consisting of "Gde. Chartreuse" under the globe, cross and seven stars. This undoubtedly is a valid mark. And the same is true of the other marks, shown on the labels attached to the bottles, which included the ecclesiastical symbols and the facsimile of the signature of L. Garnier. It follows that up to the time

of their expulsion from the Monastery, the Monks were entitled to protection against the infringement of these marks, which were their exclusive property, as well as against unfair competition.

The next inquiry is with respect to the effect of the liquidation proceedings in France. Upon the application of the Procureur of the Republic, the French court proceeded to the judicial liquidation of the properties in France held by the non-authorized congregation of the Chartreux, and it was of these properties that a liquidator was appointed. It does not appear that the court assumed jurisdiction of the trade-marks registered on behalf of the Monks in other countries. On the contrary, it appears to have been held that the question of the ownership of such trade-marks was not involved in its determination. After a successful contest of the liquidator with the Abbe Rey, in which a judgment was pronounced to the effect that the latter was an interposed person or passive trustee under a deed of transfer found to be simulated, and that the properties claimed by him personally were in fact those of the congregation and subject to the liquidation, the liquidator sought by way of interpretation of this judgment to obtain a declaration that the assets of the liquidation comprised the trade-marks registered in other countries. On refusing the application (March 27, 1906), the Court of Appeals of Grenoble used the following language,—showing that the question had not been determined in the previous decision, and also directing attention to the character of the law under which the liquidation was had as "a law of exception and police:"

"The claim of the receiver to the property of the trademarks registered in the foreign countries, raises the question whether the law of July first, nineteen hundred and one, which is a law of exception and police, controls or not, beyond the territory of the Republic, the properties of the dissolved Congregations, and whether the trade marks

registered in foreign lands are an accessory of the commercial holding of Fourvoirie, thus coming under this title into the liquidation, or whether they constitute a distinct and independent property from this commercial holding;

"The question has not been debated between the parties, and the court would not have failed, if it had been submitted to it, to treat upon it in the counts of its decision, in order to solve it in its disposition;

"The silence in this respect, exclusive of any debate on this point, does not allow of admitting, as being implicitly contained in the decree, in an ambiguous or equivocal form, the decision of which Lecouturier claims the benefit, and as the interpretation which he solicits from the court would have as effect to extend beyond what was its sole object, the matter judged by the decree of July nineteenth last;

"Such an application must be rejected as not receivable, and it is left to Lecouturier to have recourse to such means as may be deemed proper."

Hence defendant's contention is not that the French judgments, under which its principal claims, "expressly and directly settled the status of the marks abroad, but that the said judgments were effective to vest in the defendant [liquidator] the business and good will inseparably connected both in France and in this country with the place and mode of fabrication and, therefore, gave him the right, in virtue of the principles of our law, to use the trademark connected therewith."

Now what was the case with respect to the business to which the trade-marks in this country related? That business consisted of the manufacture by the Monks, according to their secret process of a liqueur of which the marks and symbols were the trade designation. They took their secret with them to Spain and continued the manufacture of the liqueur. The Monks' secret was not the subject of seizure by the liquidator and did not pass to him. It is not

pretended that he or his vendee have manufactured the liqueur at Fourvoirie under a formula or receipt derived from the Monks, but it is maintained that a formula believed to be essentially similar has been arrived at by experimentation, in accordance with which the liquidator and the French Company have been making their liqueur. We are not concerned with their authority under the French law to conduct this business, but it is not the business to which the trade-marks in this country relate. That business is being conducted according to the ancient process by the Monks themselves. The French law cannot be conceived to have any extra-territorial effect to detach the trade-marks in this country from the product of the Monks, which they are still manufacturing.

The matter was put thus by Lord Macnaghten in the House of Lords, in *Lecouturier* v. *Rey*, [1910] A. C. 262, p. 265:

"To me it seems perfectly plain that it must be beyond the power of any foreign Court or any foreign legislature to prevent the monks from availing themselves in England of the benefit of the reputation which the liqueurs of their manufacture have acquired here or to extend or communicate the benefit of that reputation to any rival or competitor in the English market. But it is certainly satisfactory to learn from the evidence of experts in French law that the law of Associations is a penal law—a law of police and order—and is not considered to have any extra-territorial effect. It is also satisfactory to find that these legal experts confirm the conclusion which any lawyer would draw from a perusal of the French judgments in evidence in this case, that the sale by the liquidator of the property bought by the appellant company has not carried with it the English trade-marks, or established the claim of the appellant company to represent their manufacture as the manufacture of the monks of La Grande Chartreuse, which most certainly it is not."

And Lord Justice Buckley said in the Court of Appeal (*Rey* v. *Lecouturier*), [1908] 2 Ch. 715, p. 733:

"Of course in this country a trade-mark can only be enjoyed in connection with a business, but I think that the monks are carrying on a business in connection with which they can enjoy any trade-marks to which they may be entitled, and the labels which were put upon the register, and in respect of which the defendant Lecouturier has had his own name placed upon the register. Are those trade-marks the property of the plaintiffs? In my opinion they clearly are."

If through his experiments the liquidator had not succeeded in making a liqueur which resembled that of the Monks, he would have had no business to transact so far as the liqueur was concerned and the transfer by operation of law would not have availed to give him one. But the property in the trade-marks in this country did not depend upon the success of the endeavors of the liquidator's experts. The Monks were enabled to continue their business because they still had the process, and continuing it they enjoyed all the rights pertaining to it, save to the extent to which, by force of th local law, they were deprived of that enjoyment in France.

Failing to establish that the Monks were divested of their exclusive rights in this co ntry by the legal proceedings in France, it is insisted that these have been lost by abandonment. This defence is based both upon non-user of the old marks and labels and upon the efforts made by the Monks, since their expulsion from France, to associate their liqueur with a new designation—as the "Liqueur des Pères Chartreux" or "Liqueur Febriquée à Tarragone par les Pères Chartreux."

But the loss of the right of property in trade-marks upon the ground of abandonment is not to be viewed as a penalty either for non-user or for the creation and use of new devices. There must be found an *intent* to abandon, or the

property is not lost; and while, of course, as in other cases, intent may be inferred when the facts are shown, yet the facts must be adequate to support the finding. "To establish the defence of abandonment it is necessary to show not only acts indicating a practical abandonment, but an actual intent to abandon. Acts which unexplained would be sufficient to establish an abandonment may be answered by showing that there never was an intention to give up and relinquish the right claimed." *Saxlehner* v. *Eisner & Mendelson Company*, 179 U. S. 19, p. 31. And this court in referring in *Singer Mfg. Co.* v. *June Mfg. Co.*, 163 U. S. 169, p. 186, to the loss of the right of property in a name "like the right to an arbitrary mark" by dedication or abandonment, quoted with approval the definition of De Maragy, in his International Dictionary of Industrial Property as follows:

"Abandonment in industrial property is an act by which the public domain originally enters or reënters into the possession of the thing, (commercial name, mark or sign,) by the will of the legitimate owner. The essential condition to constitute abandonment is, that the one having a right should consent to the dispossession. Outside of this there can be no dedication of the right, because there cannot be abandonment in the juridical sense of the word."

What basis is there in this case for a finding of intent to abandon the old marks? It is to be remembered that they were of a personal character, involving the adaptation of the name and the use of the ecclesiastical symbols of the Order. It is pointed out that, to show that there was no intention to abandon, a shipment was made to this country from Tarragona, of the Monks' liqueur, under the old marks. But it is not necessary to rest on that. The attitude of the Monks in their efforts here and in other countries to prevent the use of the old marks shows clearly that there has been no intention to abandon.

It was natural enough that the Monks, unable to use their former marks in France, should desire to bring into use a designation which could be available there as well as in other countries. But this is far from indicating the slightest disposition to surrender to the world the right to denominate liqueurs by the ancient name and symbols taken from their own Order. As soon as the liquidator, as the result of his experiments, announced that he was prepared to put upon the market "the Grande Chartreuse Liqueur" under the same labels as theretofore,—"the only guarantee of authenticity and of origin of the Chartreuse made at the monastery,"—the Monks promptly asserted their rights.

The liquidator was not moved to the use of the marks in question by any consideration of abandonment on the part of the Monks, but by virtue of their exclusion from their former abode and of the rights of succession which he claimed under the French law. The main issue between the parties has been one of title, "each claiming a right to the disputed marks to the exclusion of the other." The respective parties, and those representing them, have been in constant litigation in France and elsewhere since the liquidator was appointed, and reviewing the facts in this case we find no possible ground upon which it can be said that the Monks have abandoned the rights they possessed.

We come then to the question of remedy.

In view of the acts of the defendant, with respect to the marks, labels, and bottles shown to have been used in connection with the liqueur made at Fourvoirie after the removal of the Monks, the decree adjudging it guilty of infringement and unfair competition was plainly right. We are also of the opinion that the provisions of the injunction against infringement and simulation, set forth in the decree of the Circuit Court, were proper.

In dealing, however, with the question of unfair trade, it is to be remembered that the liquidator, and the French

Company to whom he sold, lawfully conducted the manufacturing business at Fourvoirie, and, of course, were entitled respectively to sell their product here. They were entitled to state that they made it and the the place and circumstances of its manufacture. In short, they were not debarred from making a statement of the facts, including the appointment of the liquidator and the French Company's succession by virtue of his sale, provided it was made fairly and was not couched in language, or arranged in a manner, which would be misleading and would show an endeavor to trade upon the repute of the Monks' cordial. It is also to be noted that the words. "Grande Chartreuse" form a part of the name of the French Company which it, and the defendant as its representative, had a right to use in lawful trade. But neither it, nor the defendant, was entitled to use the word "Chartreuse" as the name or designation of the liqueur it manufactured, and in any other use of that word, or in any reference to the Monks, in its statement of the facts it was bound by suitable and definite specification to make clear the distinction between its product and the liqueur made by the Monks.

These considerations, undoubtedly, led the court below to modify the decree by inserting the words—"unless so used as clearly to distinguish such liqueur or cordial from the liqueur or cordial manufactured by the complainants." But this insertion was made in connection with that portion of the injunction which related to the trade-mark, and this, we think, was error. It amounted, by reason of the juxtaposition with what preceded, to a permission to the defendant to use the trade-mark "Chartreuse" or that word as the name or description of its liqueur, provided it were distinguished from the liqueur of the Monks. This was inconsistent with the decree as to the ownership of the trade-mark.

The modification, in this form, should therefore be

struck out, but more completely to adapt the remedy to conditions disclosed, there should be inserted in the fourth paragraph of the decree—in that portion which contains the injunction against unfair trade—a provision restraining the use of the word "Chartreuse" in connection with the sales of liqueur not made by the Monks, as the name of or as descriptive of the liqueur, or without clearly distinguishing it from the Monks' product.

The decree will be amended accordingly, as shown in the margin.[1]

After the decision by the court below, application was made by the complainants for an injunction against the use by the defendant, in connection with its liqueur, of the words "Pères Chartreux." The injunction was not granted, but, the parties having been heard, the court ad-

---

[1] 4. It is further ADJUDGED, ORDERED AND DECREED that defendant, its associates, successors, assigns, officers, servants, clerks, agents and workmen and each of them be and they hereby are perpetually enjoined from using in this country or in any possession thereof, in connection with any liqueur or cordial not manufactured by complainants, the trade mark "Chartreuse" or any colorable imitation thereof—or the fac-simile signature of L. Garnier or any colorable imitation thereof—or any of the trade marks above referred to or any colorable imitation thereof; and they and each of them are likewise perpetually enjoined from importing or putting out or selling or offering for sale, directly or indirectly within this country *or in any possession thereof*, any liqueur or cordial not manufactured by complainants in any dress or package like or simulating in any material respects the dress or package heretofore used by complainants—and in particular from making use of any label or symbol like or substantially similar to those appearing on "Complainants' Exhibit Defendant's Liqueur," being the bottle now on file as an exhibit in this Court—*and from using the word "Chartreuse" in connection with the importing, putting out, or sale of such liqueur or cordial, as the name of or as descriptive of such liqueur or cordial, or without clearly distinguishing such liqueur or cordial from the liqueur or cordial manufactured by the complainant*—and from in any wise attempting to make use of the good will and reputation of complainants in putting out in this country any liqueur or cordial not made by complainants.

judged the defendant in contempt and imposed a fine. The order was reversed by the Circuit Court of Appeals, and the complainants have applied for a writ of certiorari, which is granted.

In the opinion of the Circuit Court of Appeals upon the appeal from the decree on the main issue, there were set forth two forms of labels which, it was suggested, might properly be used by the defendant, printed in any language. In the contempt proceeding it was shown that the defendant followed closely one of these forms, but used in place of the words "Carthusian Monks," as these there appeared, the description "Pères Chartreux."

In view of the language of its opinion, and the permission it implied, it is clear that the court rightly held that the defendant should not be fined for contempt. But, in saying this, we do not wish to be understood as approving the suggested forms of labels, for they seem to us objectionable in view of the arrangement of the inscription and the special prominence given to the words "Grande Chartreuse." Nor does the making of a fair and adequate statement as to the liqueur of the defendant, its origin and manufacture, require the use of the words "Pères Chartreux," and we are unable to escape the conclusion that such use, in the manner shown, was to serve the purpose of simulation, and to draw to the defendant's liqueur the reputation of that of the Monks, contrary to the provisions of the decree.

For the reasons we have stated, the order of the court below in the contempt proceeding is affirmed, but without prejudice to any future application.

*The decree is reversed and the cause is remanded with directions to enter a decree in favor of the complainants, amending the decree entered in the Circuit Court in accordance with this opinion; and the order in the contempt proceeding is affirmed without prejudice to any future application.*