## THE NAVEMAR.

### COMPANIA ESPANOLA DE NAVEGACION MARITIMA, S. A., v. CRESPO et al.

No. 15102.

District Court, E. D. New York.

Jan. 28, 1937.

154

See, also, (D.C.) 17 F.Supp. 495; (D.C.) 17 F.Supp. 647.

Bigham, Englar, Jones & Houston, of New York City (James W. Ryan, of New York City, of counsel), for libelant.

Jesse L. Rosenberg, of New York City, by Lynch, Hagen & Atkins, of New York City (Horace T. Atkins and Charles W. Hagen, both of New York City, of counsel), for Fernando De Los Rios, Ambassador of the Republic of Spain.

GALSTON, District Judge.

This is a second application made upon the affidavit of Luis Careaga, Secretary of Embassy and Consul in charge of the Consulate General of Spain in New York, who seeks on behalf of the Ambassador of the Republic of Spain to open a default and vacate a decree heretofore entered in behalf of the libelant awarding to the libelant possession of the steamship Navemar. An application for the same relief was made on December 16, 1936, and denied with permission, however, to renew the application upon a proper showing.

This affidavit recites that there is an existing Treaty between Spain and the United States (33 Stat. 2105, 2111, art. 12) by the terms of which there is granted to the envoys, ambassadors, ministers, charges d'-affaires, and. other diplomatic agents of each of the countries the same favors, privileges, and immunities and exemptions which are granted or shall be granted to the most favored nation.

It is alleged that the steamship Navemar is a Spanish vessel within the meaning of article 11 of the Treaty, in that the steamship was and is under the flag of Spain and is furnished with the papers which the laws of Spain require.

It appears that on October 10, 1936, a decree relating to this steamship was issued by the Minister of Communications and Merchant Marine of the Republic of Spain, which decree, among other matters, recites that the Republic of Spain attaches the steamship Navemar of the Compania Espanola De Navegacion Maritima, S. A., for use of the National Public Service, and that it be managed by the Minister of Communications and Merchant Marine through the General Bureau of Merchant Marine. It was decreed that the attachment and the consequent change of authority would be noted in the official registry of vessels and in the central registry of the General Bureau and on the documents of the vessel, and in the correspondng consular registries.

The Carcaga affidavit further sets forth that on November 25, 1936, the steamship arrived in the port of New York in the command of her master, Manuel Martinez, acting for and in behalf of the Republic of Spain and under the direction of the Minister of Communications and Merchant Marine through the General Bureau of the Merchant Marine; that on said day Martinez, as master, deposited the ship's roll with Careaga; and that the ship's roll is now in his possession. Careaga avers that the ship's roll shows that the Navemar arrived at Buenos Aires, Argentine, on October 9, 1936; that the vessel departed on October 16, 1936, for Rosario, Argentine, and arrived at Rosario on October 18, 1936, returning to Buenos Aires on October 26, 1936, from which port she sailed for New York on October 28, 1936. It is averred that the ship's roll discloses that Antonio I. Serrano, Spanish Consul in the port of Rosario, indorsed on the ship's rolls a legend which translated reads: "Through a cable dated 26th of the inst. month from the Director General of the Merchant Marine, this ship has become the property of the State through attachment according to the decree of October 10. 1936."

Careaga avers that he is informed and believes, though the source of his information is not set forth, that on October 28, while the steamship was at Buenos Aires, Amador Sanchez, Acting Consul General at said port, made an indorsement on the ship's register reading as follows: "Through a cable dated October 15, 1936, to the Spanish Embassy in this capitol, His Excellency, the Minister of State, notifies that this vessel has become the property of the Spanish Government through a decree of attachment published in the Official Gazette dated the 11th of the instant month."

Accordingly, Careaga alleges that he is informed and believes—though no other source of information than the foregoing is disclosed—that the sailings of the Navemar after November 15, 1936, were made at the direction and under the control of the representatives of the Spanish Republic.

On the arrival of the vessel in New York, Careaga, acting under instructions from the Ambassador of the Republic of Spain, his excellency Fernando de Los Rios, instructed Martinez that the master should await further instructions from Careaga as to any further use of the steamship Navemar. On November 28, 1936, Careaga instructed Martinez to present a detailed account of the expenses of the Navemar covering salaries, food, and the bill for the work and repairs of minor importance that the vessel might undergo. Thereafter Martinez delivered to Careaga an account of the crew of the boat and delivered a statement setting forth contemplated repairs. Careaga, so he recites, on behalf of the Republic of Spain, made partial payments on account of salaries and wages of the master and crew and "manned, victualed and supplied the vessel." On December 7, 1936, Careaga relieved Martinez of command and appointed Thomas Pasqual to act as master.

It is alleged that the vessel was held in New York by representatives of the Spanish Government for use by the Spanish Government to carry cargo from New York to Spain for the purpose of the Spanish Government, it being the intention of the government to use said vessel for such public purpose. Concluding, Careaga alleges that when the libel herein was filed, the vessel was in the possession of the Republic of Spain and subject to its direction and control for use in the national public service and that accordingly the vessel was not subject to suit or process without the consent of the Republic of Spain and in the absence of such consent is immune from the process of the court.

The question before me is whether in the present showing the moving papers meet the deficiencies which led to the denial of the former application. Exceptions are filed by the libelant. Briefly these exceptions recite that the moving papers are insufficient in setting forth ownership by the Republic of Spain, possession by the Republic of Spain, public use or operation of the vessel by the Republic of Spain, either in Argentine or in New York, or indeed at any time or place.

Reply affidavits are filed by the libellants. Martinez, the master of the vessel, deposes that neither the Spanish Consul at Rosario nor at Buenos Aires took possession of the Navemar nor did either of them inform him that they wished to take possession of the vessel or had any instructions so to do. He alleges that it is the usual practice of Spanish ship masters of privately owned merchant vessels to deposit the ship's roll with the consul on arriving at a port and receive it back before sailing, the ship's roll being merely a record of the arrivals and sailings of the vessel, together with a record of the kind of cargo carried, passengers, and the signing on or enrollment of each member of the crew. The ship's roll is not a document of title nor of possession. Neither is the ship's register a document of title or possession. The register shows the flag or nationality of the vessel as determined by the place where her home port is situated. In the ordinary course of business on arrival at Rosario, Martinez deposited the ship's roll with the consul at that port, which in ordinary course would have been returned to him just before sailing. However, the consul's office was closed for the day. He was advised by shippers of the linseed cargo at Rosario that although the cargo intended to be shipped had not all yet been loaded, it was imperative that the Navemar sail at once because the water was going down in the river and she would be delayed too long if she did not sail immediately. The shippers agreed to make arrangements to deliver the rest of the linseed cargo to the Navemar when she arrived at Buenos Aires, and the representative of the Linea Sud-Americana, Inc., the charterer of the steamship Navemar, informed him that he would call at the

consul's office at Rosario when it opened the next morning, to obtain the ship's roll and would send it by mail to Martinez, c/o Linea Sud-Americana, Inc., at Buenos Aires. Accordingly, the Navemar sailed at 5 p. m., October 23, 1936, without her ship's roll. After the Navemar's return to Buenos Aires, arriving there at 2 p. m. October 24, 1936, he was informed that the Spanish Consul at Rosario had declined to deliver the ship's roll to the agent of the Linea Sud-Americana, Inc., and would deliver it only to the master of the Navemar. Subsequently the Spanish Consul General at Buenos Aires obtained the ship's register from the master and returned both it and the ship's roll to him. The master noted the indorsement thereon made by the Consul at Rosario and on the register by the Consul General at Buenos Aires. The latter said he had no instructions to make with respect to the Navemar and that she should continue her voyage. Nothing was said about taking possession. The Spanish Consul General at Buenos Aires, however, did tell Martinez to notify Madrid that he was sailing, and accordingly Martinez did cable the General Director of Merchant Marine at Madrid, on October 29, 1936:

"Authorized by Consul General here sail for New York. Greetings.

"[Signed] Master 'Navemar'"

The Navemar is an ordinary commercial type freight steamer, of 9,000 tons' cargo carrying capacity. Carrying a general cargo for various private shippers as a common carrier for hire, she had sailed from New York September 11, 1936. After stopping at St. Thomas, Virgin Islands, at Rio de Janeiro, and at Monte Video, the vessel arrived at Buenos Aires on October 9, 1936, left on October 16th, arrived at Rosario October 17th, sailed from Rosario on October 23d, after having been loaded at Rosario with 5,800 tons of linseed in bulk shipped by private shippers to Archer-Daniels Company, a corporation of the United States, to be delivered at Edgewater, N. J. Again at Buenos Aires on October 24, 1936, she was loaded with more linseed for the same consignee and with 2,200 tons of general cargo shipped by various other private shippers to various private consignees in the port of New York. She arrived at New York at 7 a. m. November 25, 1936, and on November 27, 1936, began to discharge her general cargo at the State Barge Canal Pier in Brooklyn. The vessel then left for Edge-

water, N. J., and completed discharging the linseed on December 1, 1936. The freight was earned and was payable to the Linea Sud-Americana, Inc., on each and every shipment of the general cargo and on the linseed cargo, and each consignee was required to pay freight to Linea Sud-Americana, Inc., before obtaining a delivery order for the cargo. The Linea Sud-Americana, Inc., is a corporation of the United States and was and is a time charterer of the "Navemar" from the Compania Espanola de Navegacion Maritima, S. A. The time charter still had six months to run. The agents of the owner and of the time charterer in connection with her business in New York on arrival were Garcia & Diaz, who are the agents and have been such agents of the Navemar since Martinez was captain. They collected the freight from the various consignees on behalf of the time charterer on the occasion of the Navemar's arrival and discharge at New York and Edgewater.

Martinez, when the Navemar arrived at New York in the ordinary course of his duties, went to the office of the agents of the ship in New York, Messrs. Garcia & Diaz, and reported the arrival and asked for instructions. He was told to go ahead with the discharge of the cargo in accordance with the charter and the bills of lading, and that the Navemar was still under charter and would make another round voyage to Buenos Aires. Shortly thereafter he took the ship's roll to the Spanish Consul General's office in New York, also in the ordinary course of business, and deposited the ship's roll with him. He pointed out to Mr. Careaga the indorsement that had been made thereon and showed him the cables and radiograms. Mr. Careaga told him that he knew nothing about it and that he had no instructions whatsoever. Mr. Careaga said he would cable Madrid for instructions. Martinez apparently wanted a reply before beginning the discharge of the cargo. "Then Mr. Careaga told me to proceed unloading very slowly so that in the meantime he would be able to get some news from Madrid, to which I replied that I could not do anything like that, that the unloading would have to be completed as soon as possible and that it was not up to me to delay it, that we had to discharge as quickly as possible under contract with our consignees."

Careaga then called the Spanish Ambassador by long distance telephone and

afterwards dictated and gave Martinez a letter dated November 28, 1936, wherein it is set forth that in accordance with instructions received from the Ambassador, "the ship of your command is from this date at the disposition of the government of the Republic and you must await new instructions from him in anything concerning future activities and give me, at the earliest possible moment, a detailed statement of the expenses of said ship such as salaries, victuals, etc., as well as a relation of the repairs of small importance that you are at the present time having effected."

Martinez reported this to the agents of the owners who told him that Careaga's position was without legal authority and that he was to take instructions only from the owners of the ship. Accordingly, he followed the instructions of the owner, the Compania Espanola de Navegacion Maritima, S. A., and discharged the general cargo and linseed cargo as heretofore stated. Thereafter he made arrangements, acting on instructions from the owner, for repairs to be made by the Robbins Dry Dock & Repair Company, which had been requested by the chief engineer of the Navemar.

On December 1, 1936, while the Navemar was still at the pier at Edgewater, five members of the crew approached him on board the Navemar and said that they had been elected by the crew as a committee to take charge of the provisions and the pay of the crew. At 7 o'clock the next morning they left the vessel. At 8 o'clock the same morning, December 2, the Navemar left the pier at Edgewater and proceeded to anchor in the anchorage grounds off Red Hook flats. Martinez then visited Careaga and told him that five men had come to him and said that they had been elected a committee of the crew and that they were asserting authority over provisions and pay which was in excess of any authority under Spanish law or regulations. Careaga said that the committee had already been to see him and he approved of it. Meanwhile Martinez learned that the repair gang from Robbins Dry Dock had been prevented by the crew of the Navemar, on orders from the so-called committee, from making the repairs which had been ordered on the owner's instructions. Discussion with the crew developed that they said they were acting on instructions from Careaga and a Mr. Diaz.

Thereupon Martinez with two members of the committee visited Careaga. Careaga informed the members of the crew that he would make arrangements for provisions to be put on the boat and for payment of the members of the crew, and that the committee would be authorized to control the question of provisions and of pay. Careaga also informed them that repairs would not be made and that anything done on board would be with the knowledge and approval of the committee and that nothing would be done without their knowledge and consent. Martinez protested.

It thus appears that all material allegations and proof are before the court. The affidavit of the Spanish Consul General adds nothing to the position heretofore assumed by him. On the contrary, it is now clear beyond peradventure that prior to the seizure of the steamship Navemar in territorial waters of the United States by the committee of the crew, the steamship Navemar was never in the possession of the Republic of Spain. Pressed at the argument, counsel was compelled to concede that at most only a "constructive possession" could be asserted prior to the seizure in New York Harbor. Neither under the law of nations nor of local law is authority cited which impels a holding that such "constructive possession" is the equivalent of physical possession. So far as can be ascertained, certainly in none of the classic cases decided either in the United States or in England has such an issue been determined.

Of course, the courts of this country will not question the legality of the edict of a friendly foreign nation. Thus the legality of the decree of the Republic of Spain of October 10, 1936, wherein is set forth the confiscation of the steamship Navemar by the Spanish State, will be conceded. What the effect of such edict is on property seized beyond its domain and sovereignty is, of course, quite another matter. In United States v. Belmont, 85 F.(2d) 542, 543, the Circuit Court of Appeals for this circuit held that with respect to property physically located within Russian territory, "there can be no doubt that the decree of confiscation was effective to transfer title, and that after recognition of the Soviet government by the executive branch of our own government, the courts of this country must enforce titles and rights valid according to Rus-

sian law with respect to such property. * * * But the doctrine is otherwise with respect to property outside its own territory, which a foreign state attempts to confiscate. Laws of foreign governments have extraterritorial effect only by comity and the public policy of the forum determines whether its courts will give effect to foreign legislation. It is very clear that it is contrary to the public policy of the state of New York to enforce confiscatory decrees with respect to property located here at the date of the decree. Vladikavkazsky R. Co. v. New York Trust Co., 263 N.Y. 369, 378, 189 N.E. 456, 91 A.L.R. 1426; see, also, N.Y.Sess.Laws 1936, c. 917, adding Civil Practice Act, § 977-b. The same general principle is recognized in Baglin v. Cusenier Co., 221 U.S. 580, 596, 31 S.Ct. 669, 55 L.Ed. 863. Also in England. Lecouturier v. Rey., L.R.1910 A.C. 262, 265. This is likewise the view prevailing in most of the European countries. See authorities collected in 39 Yale L.J. 1130, 1153 et seq."

Now the case for the Republic of Spain is certainly no better than that of the Russian Government. On the contrary, its position is if anything not nearly so tenable, for the facts disclose that disregarding the orderly processes of the local law, an attempt was made forcibly to seize property within the domain of the United States. It is extremely difficult to believe that the claim of immunity set up herein by the Spanish Consul General appearing for the Spanish Ambassador, can stem from any such acts. Certainly there is nothing set forth in the opinion of Chief Justice Marshal in The Exchange, 7 Cranch (11 U.S.) 116, 3 L.Ed. 287, wherein he reviews the circumstances out of which immunity might be asserted to cover a seizure within our own territorial limits.

Not only is there no support in precedent in circumstances such as are here disclosed, but there is none in reason or public policy. Baldly, the question presented is whether a foreign nation can by edict confiscate property not within its sovereign domain nor otherwise within its possession or control, seize such property within the sovereign domain of another power, and claim immunity from suit in the courts of such latter nation. In all reason the answer to such question must be in the negative.

Moreover, the position of the present claim need not rest on such broad though controlling base. For the reasons set forth in the opinion denying the former application this application must also be denied. The steamship Navemar was not an armed vessel, was not a vessel in the public service of the Republic of Spain, was not possessed by the Republic of Spain, nor operated by it. From the time of the edict of October 10, 1936, to the time of the illegal seizure by a committee of the crew in the waters of New York Harbor, the ship was manned by officers and all members of the crew in the employ of the libelant. The vessel was under charter to the Linea Sud-Americana, Inc. On arrival here its cargo—wholly privately owned— was delivered to the consignees. The freight earned was collected by the master on behalf of the charterer.

■ Finally it may be said that there is nothing in the treaty between Spain and the United States which warrants a seizure within the United States.

■ It is urged that the court should not assume jurisdiction because the libelant is an alien corporation, organized pursuant to the laws of the Republic of Spain. Proof, however, shows that this corporation was domiciled, so far as domicile is possible to a corporation, in the United States, with its affairs directed and controlled by its agents resident in the United States. In Russian Fleet v. United States, 282 U.S. 481, 488, 51 S.Ct. 229, 231, 75 L.Ed. 473, it is said: "The petitioner was an alien friend, and as such was entitled to the protection of the Fifth Amendment of the Federal Constitution. Wong Wing v. United States, 163 U.S. 228, 238, 16 S.Ct. 977, 41 L.Ed. 140; compare Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S. Ct. 1064, 30 L.Ed. 220; Santa Clara County v. Southern Pacific R. Co., 118 U.S. 394, 396, 6 S.Ct. 1132, 30 L.Ed. 118; Truax v. Raich, 239 U.S. 33, 39, 36 S.Ct. 7, 60 L. Ed. 131, L.R.A.1916D, 545, Ann.Cas.1917B, 283; Terrace v. Thompson, 263 U.S. 197, 216, 44 S.Ct. 15, 68 L.Ed. 255; Home Insurance Co. v. Dick, 281 U.S. 397, 411, 50 S.Ct. 338, 74 L.Ed. 926 [74 A.L.R. 701]."

The application is denied, and this time without leave to renew, since it must be assumed all the facts have been fully presented.

Settle order on notice.