RAHTJEN'S AMERICAN COMPOSITION CO. v. HOLZAPPEL'S COMPOSITION CO.

(Circuit Court of Appeals, Second Circuit. April 11, 1900.)

No. 119.

1. TRADE-NAMES—UNFAIR COMPETITION—"RAHTJEN'S COMPOSITION."

A composition paint for use on the hulls of vessels was originally made and sold in Germany, prior to 1865, by Rahtjen & Sons, and acquired a high reputation, under the name of "Rahtjen's Composition." In 1869 it was introduced into this country, and has since that time been sold here continuously by the authorized agents of the original manufacturers or their English licensees, under the trade-name of "Rahtjen's Composition." In 1873 the paint was patented in England, but the patent lapsed in 1880 for nonpayment of dues. In 1883 defendant commenced the manufacture of the same paint in England, using the name of "Rahtjen's Composition," and since 1890 has sold its products in the United States. Held, that the expiration of the English patent did not affect the right of the original makers to protection in this country in the exclusive use of the name, which had, since its introduction here, constituted the trade-name of their product.

2. SAME—SUIT FOR INJUNCTION—LACHES.

A delay of eight years before commencing suit to enjoin infringement of rights in a trade-name will not bar relief, where the defendant's competition during that time was inconsiderable.

Wallace, Circuit Judge, dissenting.

101 F.—17

Appeal from the Circuit Court of the United States for the Southern District of New York.

Timothy D. Merwin and Thomas B. Kerr, for appellant.

R. B. McMaster and William B. McAdoo, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge. John Rahtjen invented, in Germany, between the years 1860 and 1865, paints specially prepared to protect the hulls of steel and iron ships from rust, and also from becoming covered by growths animal or vegetable in character. In connection with his sons, he began in 1865 to manufacture for general use, and the paints speedily acquired a high reputation in the maritime world, under the name of "Rahtjen's Composition." After his death in 1873, the business was continued in Germany by his sons, and is now carried on by John Rahtjen and Heinrich Rahtjen, under the firm name of John Rahtjen. In 1869, the Rahtjens made Henry Gelien, of Hoboken, their exclusive agent to sell their paint in the United States, with the provision that it shall be brought on the market under the name of "Rahtjen's Composition," and with the information that no patent would be applied for in this country. Gelien issued a show card for the purpose of advertising the paint under its trade-name, copyrighted the card, advertised the paint in other ways, and sold it under this trade-name to the extent of about $17,500, until the end of 1877, when he was succeeded by Hartmann, Le Doux & Maecker. In January, 1878, Suter, Hartmann & Co., of London, were appointed sole agents for the sale of the paint in this country, for whom the Hartmann firm acted as subagents for a time. The Suter Company was succeeded in 1888 by the Suter, Hartmann & Rahtjen Composition Company, Limited, which was succeeded in 1891 by the complainant corporation, which was organized under the laws of the state of New York. During the entire period from 1869 to the commencement of this suit, the goods were continuously advertised and sold under the name "Rahtjen's Composition," and the value and commercial importance of the article which Rahtjen originated, and which, as made by his firm and their successors and sold in this country, has been distinctly and widely known. The packages which came to this country from 1869 to July, 1879, were sent from Germany, and were marked "Rahtjen's Composition" or "Rahtjen's Patent Composition." From 1879 to 1883 upon each package which came to this country from the complainant's predecessors were stenciled the words "Rahtjen's Composition" in some form. Since 1883 the drums which contain the paint have been marked:

Genuine
Rahtjen's Composition
Trade (Symbol of open hand) Mark.
Hartmann's
Manufacture.

The origin of the words "Hartmann's Manufacture" will be stated hereafter. The complainant's gross business in this paint in 1897 was $128,300, in 1898 was $145,200, and in the last six months of 1898

was $106,000. The firm of John Rahtjen has continued to manufacture in Germany without patent protection. In 1871, the English firm of Suter, Hartmann & Co. was formed to sell "Rahtjen's Composition" in England, and became the sole agents of the firm of John Rahtjen for that purpose. All the paint was manufactured in Germany by the Rahtjens until 1874, when they built a factory in Liverpool, having obtained on November 29, 1873, an English patent for the product. They continued the manufacture in Liverpool until February, 1880, when they assigned their leasehold interest in the factory and the patent, and the exclusive right to manufacture the paints for sale in Great Britain and the United States, to Hartmann Bros., who carried on the manufacture, under an agreement with the Rahtjens, from 1880 until the Suter, Hartmann & Rahtjen Composition Company, Limited, was formed in 1888. Suter, Hartmann & Co. remained the salesmen until 1888, when the corporation became both the manufacturers and the vendors. The English patent, which was apparently the only one ever taken out for the paint, was forfeited for nonpayment of dues on November 29, 1880. During the manufacture by Hartmann Bros. the Rahtjens were also manufacturing in Germany, and to distinguish the English product Hartmann Bros. marked their drums "Hartmann's Manufacture," and adopted in 1883 an open hand, usually colored red, with the word "Composition" above, and the words "Hartmann's Manufacture" below, the hand, as their trade-mark for all their paints, including Rahtjen's. Suter, Hartmann & Rahtjen Composition Company, Limited, obtained the same trade-mark in the United States in 1889. Hartmann, Le Doux & Maecker had obtained a United States trade-mark in 1885 for the words "Rahtjen's Composition." The complainant is the owner of the good will and trade-mark rights of its predecessors, and is their successor in ownership thereof. The assignment of the trade-mark of 1885 by Hartmann, Le Doux & Maecker to Hartmann Bros. was not apparently acknowledged, and has not been proved by the witness to the signature. In 1883, after the Rahtjen patent expired, three brothers, under the name of Holzappel & Co., commenced to manufacture "Rahtjen's Composition" in connection with their other paints, and in 1890 became a joint-stock company under the name of Holzappel's Composition Company, Limited, which was organized under the laws of Great Britain and is the defendant. A. C. Holzappel, who joined them in 1887, had been from 1875 to November, 1881, an agent of Suter, Hartmann & Co., or connected with them or with a member of that firm, in the sale of "Rahtjen's Composition." In 1890 the defendant or its predecessors began to send its "Rahtjen's Composition" and other paints to John A. Donald & Co. of New York for sale, and in 1894 the defendant took the business, and has since carried it on in this country in its own name. It manufactures and sells other paints, the leading brand being called the "International," which kind it makes special effort to sell. The business of the defendant in the United States from 1890 to 1895, including a few small invoices sent to different persons from 1883 to 1890, amounting to about 92 cwt., was a fraction over 2,142 cwt. It has always been sold as "Rahtjen's Composition, Holzappel's Manufacture," and no

effort has been made to conceal the fact that the defendant was the manufacturer. After the English patent expired, the successors of Rahtjen attempted to obtain an English trade-mark bearing the name of "Rahtjen," but were unable to do so, except upon a disclaimer of an exclusive use of the words "Rahtjen's patent composition for ships, bottoms, buoys, etc., or of any of such words, except as a part of the combination constituting our trade-mark."

Although minor issues of fact were presented in the proofs, the facts which have been recited are those of chief importance in the case, with the exception of those bearing upon the question of laches. The defendant's case rests mainly upon the position that, after the forfeiture in 1880 of the English patent of 1873, the name "Rahtjen's Composition" became generic in this country, and the article could be manufactured and sold in this country by any person who described himself as the manufacturer. Reliance is placed upon the case of Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118. It appears that the firm of John Rahtjen introduced their paint into this country in 1869, and preferred not to attempt to obtain the protection of a patent, but to gain both reputation and protection by the character of the article, and for that purpose required that it should be sold as their product, and under a trade designation. That system has been continued by each owner of the business in this country to the present time, and the name of the inventor has become fastened upon the products. If a trade-mark exists in this country in the name of "Rahtjen's Composition," the complainant is the owner of it by virtue of the right of succession, as stated in the well-known case of Le Page Co. v. Russia Cement Co., 2 C. C. A. 555, 51 Fed. 941:

"It is equitable that a manufacturer or dealer, who has given reputation to any article, should have the privilege of realizing the fruits of his labors by transmitting his business and establishment, with the reputation which has attached to them, on his decease to his legatees or executors, or during his lifetime to purchasers; and it is also in accordance with the principles of law, and with justice to the community, that any trade-mark, including a surname, may be sold with the business or the establishment to which it is incident, because, while it may be that individual efforts give them their value at the outset, yet afterwards this is ordinarily made permanent as a part of the entire organization, or as appurtenant to the locality in which the business is established, and thenceforward depends less on the individual efforts of the originator than on the combined result of all which he created."

It further appears that after 1869 the only patent which was ever taken out in any country for the paint was the English patent of 1873, which lapsed by Hartmann & Bros.' nonpayment of dues in 1880. The asserted consequence is that, because the name then became publici juris in Great Britain, it became public property everywhere. There was in 1880 a valid trade-mark right in the United States, which the Rahtjens and their successors had acquired. The lapse of the English patent neither broke this trade-mark nor interfered with the title of its owners. They owned it, and, although the lapse of the English patent interfered very seriously with their title to exclusive rights in Great Britain, it was ineffectual upon title in another country. In England the Rahtjens undertook to acquire ex-

clusive rights by virtue of the patent laws. In the United States they had previously acquired exclusive rights by the common law. Their failure in England does not cause a cessation of their common-law rights in the United States. The lapse of the English patent could not cause a lapse of trade-mark rights throughout the world.

The Singer Mfg. Co. Case, supra, had exclusive reference to the continuance of a monopoly in this country upon which letters patent of this country had expired, and the court held that the right to use the name passed to the public in this country with the expiration of the exclusive right created by the patent to make and sell the article. The decision followed the previous general course of decisions in the courts of this country and elsewhere, but it did not relate to the facts of this case, as obviously appears in the opinion of Mr. Justice White, who spoke for the court. In the Scotch and English and French sewing-machine cases for an injunction against the use of the name of the maker, wherein the injunction had been granted, the machines had not been patented in those countries. In the French case of Howe, where the French courts enjoined the use of that name on a sewing machine, the court, as a basis of its decree, used the following language:

"And whereas, they [Howe and his heirs] did not take patents in France for the invention and their improvements, which have therefore fallen into the public domain, and have never, either expressly or tacitly, abandoned the right to affix his name [that of Howe] to the products of the invention." Singer Mfg. Co.'s Case, 163 U. S. 195, 196, 199, 16 Sup. Ct. 1014, 41 L. Ed. 129.

It is a matter of common knowledge that Howe took out patents upon his machine and its improvements in this country.

Attention is called by the defendant to two continental decisions, one of the Brussels court of appeals and the other of the criminal chamber of the land court at Hamburg, in cases respecting the exclusive right of the Rahtjens to the trade-mark. The Brussels decision was based upon the fact, as found, that in Belgium the name indicated an article, and not the maker. The attempt is made in this case to show that in the public mind in this country the name of "Rahtjen's Composition" is a descriptive name, which is understood to designate a thing, and not its origin; as, for example, the word "hansom," when applied to a cab, now means simply a particular style of vehicle. We are not able to find from the record, as a fact, that in the United States the name "Rahtjen's Composition" has become a generic name, and now means a composition made by any one after the original formula of Rahtjen. A few witnesses say that they supposed that the complainant and the defendant were competitors in the manufacture of an article called by the same name, but the testimony does not show that the fact exists in this country, which was found by the Brussels court of appeals, that:

"In the eyes of the public, this name of 'Rahtgen' has become a sort of qualifying adjective, indicative of this special product."

The Hamburg case was a criminal one, founded upon a criminal statute, and the representatives of Holzappel were not found to have committed the offense which was defined by the existing statute, and

which was, in substance, having knowingly made untrue statements of fact.

The defendant next insists that the complainant's laches should prevent any decree in its favor. It is true that the defendant has sold its manufacture of "Rahtjen's Composition" to a certain extent since 1890, but the sales have been comparatively small, and did not interfere with the complainant's business to any marked extent, until the defendant obtained a contract with the naval department of the United States government, in answer to a call for offers of "Rahtjen's Composition," when suit was promptly commenced. The defendant's chief brand of paint is the "International Composition," and it has been their endeavor to sell that brand, if they could, "and, failing that, 'Rahtjen's Composition.'" The defense of laches is nominal, rather than real, for the defendant's interference with the property rights of the plaintiff was for many years inconsiderable, and under no decision merits a refusal of a decree of injunction. Under all the circumstances of the case, we are not inclined to direct a decree for an accounting.

The decree of the circuit court (97 Fed. 949) is reversed, with costs, and the case is remanded to that court, with instructions to enter a decree enjoining the defendant from selling or offering to sell paint under the name of "Rahtjen's Composition," and from using that name upon its, packages or in its advertisements as belonging to paint of its manufacture, in accordance with the foregoing opinion, and for costs of that court.

WALLACE, Circuit Judge. I dissent from the opinion of the court. I am of the opinion that the alleged trade-mark of the complainant is public property—First, because the name was the generic description of a patented article, and passed to the public upon the expiration of the patent; and, secondly, because the name has long ceased to denote the source of the manufacture of the article. Rahtjen and his sons were the original manufacturers and sellers in Germany of an article which they called "Rahtjen's Composition," made after a formula originated by one of them, and having properties peculiarly useful for preserving the hulls of vessels. In November, 1873, Rahtjen obtained a patent in England for the article. "Rahtjen's Composition" gradually became known to the maritime world as the name of an article made according to the formula of the patent. The monopoly under the English patent expired in 1880. Thereafter the article was made and sold by manufacturers by the name of "Rahtjen's Composition" in England and on the continent, and the name ceased to designate any particular source of manufacture. The successors of the original manufacturers, who had acquired the sole right to manufacture and sell the article in England, when they applied there for the registration of a trade-mark for the article, disclaimed the exclusive right to that name. When they sought in 1886 to prevent manufacturers in Belgium from selling the article as "Rahtjen's Composition," the Belgian courts refused relief; deciding that any person who did not represent the article as purporting to be manufactured by the Rahtjens or their successors

in business had a right to sell it under the name by which it had become generally known. I am at a loss to understand why any different decision should be made in this country; but the court seems to be of opinion that the name is a good trade-mark here, because no patent was ever obtained for the article in this country, and because the successors in business of Rahtjen have always sold it here under the name originally applied to it. This means that a man can have a trade-mark in this country in a name which is common property everywhere else. If this is good law, then any person here buying in Belgium, or elsewhere in Europe, or in England, the article known as "Rahtjen's Composition," can be prevented from dealing in it here under the name by which he bought it. So long as Rahtjen and his associates and successors in business enjoyed a monopoly of the manufacture of the article, the name not only identified the characteristics of the article, but also denoted the source of manufacture; but when the monopoly ceased, and the article passed into the domain of public property, the name which had been its generic designation also passed. Their monopoly has ceased to exist in this country as well as abroad, and the property in the name can no more survive here than it can abroad.

Irrespective of the effect of the expiration of the patent, the designation has become publici juris through its long use by dealers in the article which it describes; and whether this is attributable to the acquiescence of the complainant and its predecessors, or to their laches, is immaterial, since their conduct, active or passive, has led to the result. One test by which to determine whether a word which was originally a trade-mark has become publici juris is whether the use of it by persons other than the original owner is still calculated to mislead the public, and induce them to buy goods not made by the original owner, upon the supposition that they are his goods. Whenever the name has come to be so generally understood by the public dealing in the article, as denoting the article itself, that nobody can be deceived by the use of it into the belief that it was made by any particular person, the right to it as a trade-mark is gone. Ford v. Foster, 7 Ch. App. 611. If that test is applied to this case, there can be no doubt the name is no longer a valid trade-mark.

There is no pretense that the defendants have represented their article to be the manufacture of the complainants, or of their predecessors in business. I think the case was properly decided in the court below, and that the decree should be affirmed.