## ANSEHL v. WILLIAMS.

(Circuit Court of Appeals, Eighth Circuit. July 15, 1920. Rehearing Denied September 27, 1920.)

No. 5503.

1. **Trade-marks and trade-names ☞28—Extent of use not material.**

In determining right to a trade-mark, the fact that plaintiff's business, in connection with which the mark was used, was larger than that of defendant, is not decisive, since it is not essential that use of the trademark has been long-continued, or that the article is widely known, or has great reputation.

2. **Trade-marks and trade-names ☞32—Abandonment involves intention to abandon.**

Abandonment of a trade-mark by the owner, which defeats his rights thereto, rests upon an intent to abandon.

3. **Trade-marks and trade-names ☞93(1)—Burden is on party claiming abandonment to prove it.**

In a suit for infringement, the burden is on the party claiming abandonment by another of his trade-mark to prove the intention to abandon the business under the trade-mark.

4. **Trade-marks and trade-names ☞32—Engaging part time in other employment, while business was continued by others, not abandonment.**

The owner of a trade-mark did not abandon his rights thereto by accepting employment for another for a period of eight months, during part of which he was out of the city, where the business was conducted in the meantime, either by himself outside of working hours or by his wife and sisters.

5. **Trade-marks and trade-names ☞97—Delay of two years in bringing suit held not laches, barring injunction.**

A delay of two years in bringing suit to restrain the use of trade-mark after knowledge of the infringement, and then seeking infringement only by cross-complaint in a suit by the owner of the other trade-mark, is not such laches as bars the right to injunction.

6. **Trade-marks and trade-names ☞45—Registration of plaintiff's trade-mark does not affect rights to unregistered trade-mark first used by defendant.**

Neither defendant's failure to register his trade-mark, nor the regis-

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tration of plaintiff's trade-mark before application by defendant, affects defendant's right to a trade-mark which he used first.

**7. Trade-marks and trade-names ⬤⟿93(3)—Evidence held not to show fraud to defeat trade-mark.**

The representation that defendant's trade-mark was registered, made in the belief that he could use that statement after his application to register, and statements as to the composition of his product, *held* not to show fraud, nor to show that his preparation was dangerous, and therefore not to defeat his right to trade-mark.

**8. Trade-marks and trade-names ⬤⟿59(5), 97—"Lash-Brow-Ine" held to infringe "Lashbrow."**

Plaintiff's trade-mark, "Lash-Brow-Ine," is sufficiently similar to defendant's prior trade-mark, "Lashbrow," to constitute an infringement, and to entitle defendant to an injunction restraining further use of its trade-mark.

**9. Trade-marks and trade-names ⬤⟿65—Infringing trade-mark need only be calculated to deceive ordinarily cautious purchasers.**

It is sufficient to constitute infringement that the infringing trade-mark is calculated to deceive ordinary purchasers using ordinary caution.

Appeal from the District Court of the United States for the Eastern District of Missouri; David P. Dyer, Judge.

Suit by Thomas L. Williams, doing business as the Maybell Laboratories, against Benjamin Ansehl, doing business as the Lashbrow Laboratories Company. From a decree enjoining defendant from using the alleged trade-mark, and from unfair competition, defendant appeals. Reversed and remanded, with directions to restrain plaintiff from further use of its trade-mark.

Robert D. Totten, of Pittsburgh, Pa. (Kay & Totten and Robson D. Brown, all of Pittsburgh, Pa., on the brief), for appellant.

James Rosenthal, of Chicago, Ill. (Marion C. Early, of St. Louis, Mo., on the brief), for appellee.

Before HOOK and CARLAND, Circuit Judges, and TRIEBER, District Judge.

CARLAND, Circuit Judge. Appellee brought this action against appellant for trade-mark infringement and unfair trade competition. Appellant filed a cross-complaint, alleging infringement of his trade-mark and unfair trade competition on the part of appellee. A decree was rendered enjoining appellant from using his alleged trade-mark and from unfair competition. No accounting was granted. The material facts as shown by the record are as follows:

In September, 1915, appellee, under the name of Maybell Laboratories, commenced selling at Chicago, Ill., a preparation for promoting and stimulating the growth of eyebrows and lashes, under the trade-name of Lash-Brow-Ine. The name was suggested by preparations of a similar character then on the market under the names of Eye-Brow-Ine and Lashneen. The suffix "ine" was used, because the principal ingredient contained in appellee's preparation was chiefly petrolatum, a form of vaseline. Appellee commenced to advertise his preparation in October, 1915, and since then has advertised in over 50 different maga-

zines, and had paid for advertising at the time of trial $67,084.19; the monthly expense for advertising having increased to about $3,000 per month. The preparation, sold directly to consumers at 50 cents per box, had amounted to 149,000 mail orders since the business was started. Sales were also made in gross to about 3,000 dealers, located in every state of the Union. Appellee testified that he never heard of Lashbrow, or Lashbrow Laboratories, until about September 1, 1918. About November 1, 1918, appellee caused appellant to be notified to cease infringing appellee's trade-mark. Appellant refusing so to do, this suit was commenced December 17, 1918.

Since commencing the sale of his preparation appellee has done a business amounting to $111,759.73. The trade-mark Lash-Brow-Ine was registered in the United States Patent Office April 24, 1917. The main ingredients of the preparation sold by appellee were a superfine petrolatum and paraffine, a high-grade perfume, and other small ingredients. No reply was received by appellee to the notification above stated until November 11, 1918, when the receipt of the letter of appellee of November 1, 1918, was acknowledged with a statement that appellant had used the trade-mark "Lashbrow" much earlier than 1915, and a request that appellee desist from infringing the same, or suit would be brought by the appellant for an injunction and an accounting. No such suit was brought.

There was introduced in evidence a large number of advertisements appearing in various publications. The evidence on the part of appellant showed that he conceived the idea of manufacturing and putting on the market a preparation for stimulating and promoting the growth of eyebrows and eyelashes in 1911; that the formula for this preparation was one used by his mother for her eyebrows and eyelashes when she was a girl. Appellant commenced selling his preparation in the spring of 1912, under the trade-mark of "Lashbrow," to a small drug store on Jefferson and Lafayette avenues in the city of St. Louis, Mo. This was followed by soliciting trade from all the large dealers and retail stores in St. Louis, where the preparation was offered for sale. Appellant then started a campaign of advertising which began on October 12, 1912, in the St. Louis Post-Dispatch. This advertising brought him business from nearby states, such as Illinois and Indiana, and the entire Southwest. Appellant's business has been conducted since its commencement at 1755 Preston street, St. Louis, Mo., where he was doing business when enjoined in May, 1919. The stores referred to by appellant in his testimony were Wolf-Wilson, Judge & Dolph, Grand Leader, Famous & Barr, Nugent's, Hirsch's Hair Bazaar, and Schaper, being the leading stores in St. Louis. The preparation was sold through these stores in 1912. Appellant had printed 1,000 cardboard fliers and 1,000 transparent fliers, which were mailed to about 1,500 stores throughout the United States. A counter display card was also distributed throughout the country in 1913. A sample of appellant's preparation was mailed to the buyers of about 800 or 900 department stores throughout the country.

In order to get quicker national distribution, appellant testified that he called upon Meyer Bros. Wholesale Drug Company, in St. Louis,

the largest wholesale drug concern in the world, as appellant understood, and asked them to make a thorough analysis of Lashbrow, with a view of having all of their 75 salesmen, who traveled in all parts of the United States, sell Lashbrow. Mr. Peet was then the buyer at Meyer Bros., and offered to do this, and as a result of appellant's request Lashbrow was entered upon the regular catalogue price list of Meyer Bros. This was late in 1912. Lashbrow has been carried by Meyer Bros. Drug Company in their catalogue until the present time and sold throughout the entire United States. Appellant also introduced it to the J. S. Merrill Wholesale Drug Company, in St. Louis, in 1912, and since said date, until the present time, the preparation has been carried by the most reputable wholesale drug houses in the United States, such as McKessen & Robbins, Lehn & Fink, and Schifflein, of New York City, J. W. Crowdus Wholesale Drug Company, Dallas, Tex., Alexander Drug Company, Oklahoma City, Okl., Stewart & Palmer, Seattle, Wash., and numerous others that the witness did not recall.

Appellant had very little means with which to exploit his preparation at first, and the business carried on did not reach the extent of that of appellees. The evidence shows, however, that appellant has done the best he could in the way of promoting the sale of his preparation. From 1912, down to December, 1915, three months after appellee had first adopted his trade-mark, appellant had advertised in 16 national magazines such as "Grit," "Red Book," "Cappers Weekly," "Photoplay," etc. In 1914 appellant ran a campaign of advertising in the St. Louis Globe-Democrat. He testified that during 1912, he spent $500 or $600 in advertising Lashbrow; during 1913, about $900 or $1,000; during 1914, about $2,500; during 1915, about $2,500 or $3,000; during 1916, a little over $2,000; during 1917, between $4,000 and $5,000; and in 1918, about $6,000. Up to 1915 he had purchased at least 79,056 jars or 549 gross, and invoices were produced for these amounts. Appellant's Exhibit 10, introduced in evidence, showed 243 original orders for Lashbrow, coming from 31 states of the Union, during the years 1912, 1913, 1914, 1915, 1916, and 1917.

[1] The foregoing in a general way is what the evidence shows as to the business done by appellant and appellee. That of appellee was larger than that of appellant, but this fact is not decisive. In the case of Kathreiner's Malzkaffee Fab. v. Kneipp Medicine Co., 82 Fed. 321, 27 C. C. A. 351, the Court of Appeals of the Seventh Circuit said:

"It is not essential that its use has been long continued, or that the article should be widely known, or should have attained great reputation. The wrong done by piracy of the trade-mark is the same in such case as in that of an article of high and general reputation, and of long-continued use. The difference is but one of degree, and in the quantum of injury. A proprietor is entitled to protection from the time of commencing the user of the trade-mark."

See, also, Waldes et al. v. International Manufacturers' Agency (D. C.) 237 Fed. 502; Walter Baker & Co. v. Delapenha (C. C.) 160 Fed. 746.

[2] To avoid the force of appellant's prior use of his trade-mark, appellee claims that there was an abandonment of the same by appellant. Upon the question of abandonment it was said by the Supreme Court in the case of Hanover Milling Co. v. Metcalf, 240 U. S. 403, 36 Sup. Ct. 357, 60 L. Ed. 713:

"It results from the general principles thus far discussed that trade-mark rights, like others that rest in user, may be lost by abandonment, nonuser, laches, or acquiescence. Abandonment, in the strict sense, rests upon an intent to abandon; and we have no purpose to qualify the authority of Saxlehner v. Eisner, 179 U. S. 19, 31, to that effect. As to laches and acquiescence, it has been repeatedly held, in cases where defendants acted fraudulently or with knowledge of plaintiffs' rights, that relief by injunction would be accorded, although an accounting of profits should be denied. McLean v. Fleming, 96 U. S. 245, 257; Menendez v. Holt, 128 U. S. 514, 523; Saxlehner v. Eisner, 179 U. S. 19, 39. So much must be regarded as settled."

[3, 4] The burden of showing abandonment was upon appellee, and we find no evidence that appellant intended to abandon the business of selling his preparation under the trade-mark adopted by him. It does appear that appellant was employed for 8 months during the year 1917, by Crundin-Martin Manufacturing Company, of St. Louis. During that time he spent 2 months in Cincinnati. In regard to this employment appellant testified:

"A large part of this 8 months I was right here in St. Louis, and I attended to my Lashbrow business in the evening, and also called upon the stores in the daytime. I was outside all the time, and the short time I was away from St. Louis, as is customary any time I am away from St. Louis, my folks attended to my business, and the business is conducted right in the house. This 8 months were about the first 8 months in the year. I was in St. Louis for that concern about 6 months out of the 8. I do not know how long I was in Cincinnati; my recollection is 2 months."

Appellant's place of business was in an old residence consisting of two flats, the lower one of which was used for the Lashbrow business the upper as a residence. Mr. Bernayas, who was the secretary and manager of the Crundin-Martin Company, testified that, out of the 8 months appellant was employed in 1917 by that company, he spent all of the time, with the exception of 60 or 90 days, in Cincinnati. Mr. Bernays subsequently filed an affidavit in this cause, which appears in the record wherein he testified that after an examination of the company's books he found that instead of appellant being away from St. Louis for from 5 to 6 months of said period of 8 months, he was away only 73 days; the balance of the period being spent in St. Louis. We do not think that this absence of 73 days showed any intention of abandonment by appellant, as the evidence shows that the business was carried on continuously during said absence by his wife and sister, they being perfectly competent to fill all mail orders, and in view of the further fact that Mr. McTigue, of Meyer Bros. Drug Company, testified that there was no cessation of the efforts made by appellant in advertising and popularizing Lashbrow. Baglin v. Cusenier, 221 U. S. 580, 31 Sup. Ct. 669, 55 L. Ed. 863. There is also no evidence of nonuser by appellant. He used the trade-mark contin-

uously from the time he entered the field in 1912 until the injunction was issued in this cause.

[5] Appellee also claims that appellant was guilty of laches, because of his failure to bring suit to establish his common-law rights under his trade-mark. The evidence shows that appellant learned some time in 1916 that Lash-Brow-Ine was on the market. He testified that he wrote a letter to appellee, calling his attention to the matter. In November, 1918, appellant again notified appellee that he was infringing appellant's trade-mark, and of his intention of bringing suit for infringement. It was about 2 years from the time that appellant first learned about the use of his trade-mark by appellee until litigation was begun. Litigation, especially patent and trade-mark litigation, is expensive, and we do not think that the delay in this case should bar appellant from asserting his rights in this action. The Supreme Court of the United States, in Menendez v. Holt, 128 U. S. 514, 9 Sup. Ct. 143, 32 L. Ed. 526, held that mere delay in bringing suit to restrain infringement of a trade-mark, while it might preclude recovery for prior infringement, would not defeat the right to an injunction against future infringement. In the cases where laches has been held to bar the right of action, it has extended over a greater period than 2 years, and in the case of Saxlehner v. Eisner, supra, 179 U. S. 19, 21 Sup. Ct. 7, 45 L. Ed. 60, there was a delay of 20 years. In Rahtjen's American Composition Co. v. Holzappel's Composition Co., 101 Fed. 257, 41 C. C. A. 329, it was held under the facts in that case that a delay of 8 years in bringing suit to restrain infringement would not bar complainant's right to relief. In the case of Peter H. Fahrney & Sons Co. v. Ruminer et al., 153 Fed. 735, 82 C. C. A. 621, plaintiff's laches was held not to be a defense to its right to an injunction restraining defendant's further misconduct. To the same effect is Eagle White Lead Co. v. Pflugh (C. C.) 180 Fed. 579.

[6] Appellant's failure to register his trade-mark before that of appellee in no way affects appellant's rights. Neither does the registration of appellee's trade-mark confer a right to infringe that of appellant. Glencove Mfg. Co. v. Ludeling (C. C.) 22 Fed. 823; Brower v. Boulton, 58 Fed. 888, 7 C. C. A. 567; Revere Rubber Co. v. Consolidated Hoof Pad Co. (C. C.) 139 Fed. 151; United Drug Co. v. Rectanus Co., 248 U. S. 90, 39 Sup. Ct. 48, 63 L. Ed. 141.

[7] It is further insisted that appellant made certain misrepresentations in regard to his business and the sale of his goods, which bars him from relief. One of these misrepresentations is that on certain of his advertising matter appellant used the words "Trade-mark, reg. U. S. Pat. Off.," and that he issued a certain booklet in which was printed, "Copyright Lashbrow Laboratories Company." Appellant's excuse for this is that he had applied for registration of the trade-mark, which had been refused on the previous trade-mark of appellee; that his understanding was that, the application for registration having been made, he had the right to use these words. This is a mistake that might be made by a layman, and we do not think that it was such a misrepresentation that would in any way injure the public or affect the rights of the public. Solis Cigar Co. v. Pozo, 16 Colo.

388, 26 Pac. 556, 25 Am. St. Rep. 279; M. B. Fahey Tobacco Co. v. Senior (D. C.) 247 Fed. 809; Wormser v. Shayne, 111 Ill. App. 556.

It is further insisted by appellee that appellant should be barred from equitable relief for the reason that he referred in his advertisement to Lashbrow as of two qualities, "Natural Growth" and "Dark Growth." The preparation that was referred to as "Dark Growth" contained charcoal, and appellant claimed he never intended that this would create a dark growth, but, as he testified, was intended to induce a natural growth and at the same time darken the color of the eyebrows and lashes. He further testified that the dark growth—

"is a preparation to stimulate the growth of eyebrows, and at the same time to darken their color. I claim that my preparation will darken light eyebrows, positively so; that they will keep their color, I do not claim. * * * We do not advertise that it produces a dark growth."

There was no doubt some puffing in regard to the dark growth, but it did not amount to fraud upon the public. Nims on Unfair Competition and Trade-Marks, § 404. We are of the opinion that it is not shown that appellant's preparation is so inferior as to bar his right to relief. The chemist who testified in regard to its composition did not claim that it was dangerous for the purpose intended. He did testify that, if it was not applied according to directions and got into the eye, it would irritate the eyelids, on account of the insoluble material which he found in the preparation. In opposition to this evidence the appellant called an expert witness, an oculist of 25 years' practice in St. Louis, who testified that the salve or compound made up of beeswax and vaseline and powdered willow carbo-lignite, which was the compound of appellant's preparation, when applied to the eyebrows and eyelashes, could not injure the eyes. Appellant also testified that he had never had any complaint in regard to any injurious effect from the use of Lashbrow of either color. As between appellant and appellee, there can be no question as to who was the first to adopt the trademark. In the case of United Drug Co. v. Rectanus Co., supra, 248 U. S. 90, 39 Sup. Ct. 48, 63 L. Ed. 141, the Supreme Court said:

"Undoubtedly, the general rule is that, as between conflicting claimants to the right to use the same mark, priority of appropriation determines the question. See Canal Co. v. Clark, 13 Wall. 311, 323; McLean v. Fleming, 96 U. S. 245, 251; Manufacturing Co. v. Trainer, 101 U. S. 51, 53; Columbia Mill Co. v. Alcorn, 150 U. S. 460, 463."

[8, 9] We are also of the opinion that there is such a similarity between the appellant's trade-mark and that of appellee that the trademark of appellee clearly infringes that of appellant. The following have been held to be infringements: In Rowley v. Houghton, 2 Brewst. (Pa.) 303, "Heroine" and "Hero"; Fairbanks Co. v. Luckel et al., 102 Fed. 327, 42 C. C. A. 376, "Gold Drop" and "Gold Dust"; Little v. Kellan (C. C.) 100 Fed. 353, "Sorosis" and "Sartoris"; Burnett v. Phalon, *42 N. Y. 594, "Cocaine" and "Cocoine"; Celluloid Mfg. Co. v. Cellonite Mfg. Co. (C. C.) 32 Fed. 94, "Celluloid" and "Cellonite." It is sufficient that the infringing trade-mark is calculated to deceive ordinary purchasers, using ordinary caution. Amoskeag Mfg. Co. v. Trainer, 101 U. S. 51, 25 L. Ed. 993.

In view of the facts appearing in the record, we think the decree below must be reversed, and the case remanded, with directions to enter a decree enjoining the appellee from further use of the trade-mark Lash-Brow-Ine, but, in view of the record, we do not think there should be an accounting.

Reversed.