486 F.2d 114
 179 U.S.P.Q. 577
 SHEILA'S SHINE PRODUCTS, INC., a California corporation,
Plaintiff-Appellee-Cross Appellant,
v.
SHEILA SHINE, INC., a Florida corporation, et al.,
Defendants-Appellants-Cross Appellees.
SHEILA'S SHINE PRODUCTS, INC., Plaintiff-Appellant,
v.
SHEILA SHINE, INC., et al., Defendants-Appellees.
 Nos. 71-3407, 72-1294.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 11, 1973.
Rehearing Denied in No. 71-3407 Nov. 16 1973.
 
 James V. Johnstone, Miami Beach, Fla., Creel & Glasgow, Joe Creel, Miami, Fla., for Sheila Shine, Inc. and others.
 Louis Schneiderman, Miami, Fla., George B. White, San Francisco, Cal., for Sheila's Shine Products, Inc.
 Before GEWIN, SIMPSON and RONEY, Circuit Judges.
 SIMPSON, Circuit Judge:
 
 
 1
 These two cases arise from protracted trademark litigation between the parties. Plaintiff-appellee, Sheila's Shine Products, Inc., a California corporation (SS California) initiated this action against defendant-appellant, Sheila Shine, Inc., a Florida corporation (SS Florida) and certain of SS Florida's officers and employees: William S. Wallach, Philip Wallach, and Don Solomon as individual defendants. A general partnership, Pan American Chemical Company, formerly composed of William Wallach and Don Solomon, was also named as a defendant. SS California's complaint asked injunctive relief and damages, claiming unfair competition based upon common-law trademark infringement, tortious and unlawful interference with its business, and fraud and deceit. SS Florida counterclaimed on the same basis as plaintiff's complaint, and also alleged infringement of defendant's federal and state registered trademark. In answer to the original complaint, SS Florida pleaded a purchase of plaintiff's business from SS California's predecessors in interest, abandonment, estoppel, laches and statutes of limitations. In response to the counterclaim, SS California pleaded laches and statutes of limitations.
 
 
 2
 The action was tried before the court below and a jury. The jury found generally in favor of plaintiff SS California but assessed no damages, either compensatory or punitive, against either the corporate defendant SS Florida or against the individual defendants.[1] Following receipt of the jury's verdict, the trial court made findings of fact and conclusions of law and granted limited equitable relief in favor of both parties. The principal appeal, case No. 71-3407 involves SS California's and SS Florida's appeals from adverse portions of the lower court's decree. In addition, SS California appeals from a later order of the lower court granting sanctions for violation of the court's original order and refusing to approve SS California's new label design. This appeal is case No. 72-1294.
 
 The Principal Appeal-No. 71-3407
 
 3
 Near the end of 1945, Daniel G. McCafferty and his wife, Helen McCafferty, commenced a business of home manufacture and sale of metal and wood polish in Long Beach, California. The polish was originally named "Sheila's Shine", after the McCafferty's infant daughter Sheila. The McCaffertys also devised a trademark for the labels on the polish containers. The trademark consisted of a picture of their daughter, Sheila. The McCaffertys subsequently shortened the name "Sheila's Shine" to "Sheila Shine". Defendant SS Florida conceded first use of the name "Sheila Shine" by the McCaffertys, who were SS California's predecessors in interest.
 
 
 4
 From 1945 until the formation of SS California in 1967 the McCaffertys operated from various California cities, including Long Beach, Morro Bay, and San Francisco. Between 1953 and 1967 the McCaffertys also used property in Caliente, Nevada, for the purpose of mixing and storing polish. Additionally, from 1957 until about the time of Daniel McCafferty's death in July, 1965, the McCaffertys also used property owned by Helen McCafferty's son Robert Belt in Verdi, Nevada, for mixing polish.
 
 
 5
 Prior to June of 1967, at which time Helen McCafferty organized the plaintiff corporation, the McCaffertys used two basic methods of marketing the polish. Principally, the McCaffertys themselves would travel from city to city with a load of polish, selling it personally door to door to restaurants, bars, and other business establishments. In addition, the McCaffertys would also sell polish outright to various "salesmen" for resale on their own terms. With minor exceptions, these salesmen maintained no permanent contact with the McCaffertys, and they did not report back to the McCaffertys concerning polish resales.
 
 
 6
 The small family business was confined to Long Beach and its environs until 1947, when the McCaffertys embarked on what Helen McCafferty described as the first transcontinental trip. During this trip the McCaffertys used the two sales methods described above, direct personal sales and sales to salesmen who answered newspaper ads and purchased polish for resale. During this trip the McCaffertys went to Miami, Florida, and while there appointed Pan American Chemical Company, a partnership composed of defendants William S. Wallach and his father, Philip Wallach, as distributors of Sheila Shine Polish. Pan American obtained polish from the W. B. Fleming Company (Fleming) of Jacksonville, Florida, to whom the McCaffertys had previously given an exclusive right to manufacture and sell the polish in Florida. Pan American continued to act as a distributor of the polish supplied by Fleming until early 1955.
 
 
 7
 The McCaffertys took a second transcontinental trip in 1954, using the same sales methods as before. In January of 1955, the McCaffertys again visited Miami, Florida. About January 11, 1955, an arrangement was made between the McCaffertys and the Wallachs doing business as Pan American. Pan American contended that this agreement constituted an outright purchase by Pan American of the Sheila Shine polish business from the McCaffertys, whereas Helen McCafferty contended that the transaction constituted only a reappointment of Pan American as Sheila Shine distributor for the state of Florida. The trial court found as a fact "that Pan American Chemical Company was at least granted the exclusive right to manufacture and sell the polish in the state of Florida in the January, 1955 transaction."[2]
 
 
 8
 A few weeks after the January 11, 1955, transaction the McCaffertys returned to California. From February of 1955 until Helen McCafferty and her son Robert Belt returned to Miami in May of 1966, there was never any inquiry by the McCaffertys of Pan American and no communication of any kind passed between the McCaffertys and Pan American. The district court found as a fact that there was no direction or supervision after January of 1955 by the McCaffertys over Pan American, nor was any such supervision or direction attempted at any time.
 
 
 9
 Following their return to California in 1955, the McCaffertys' selling operations until 1968 were primarily confined to those areas of California around San Francisco and Los Angeles. In addition there were occasional selling trips into Nevada, several selling trips between 1955 and 1958 to Utah, Nevada, and New Mexico, and a 1963 trip to Oregon, Washington, Utah, Colorado, and Nevada. Except for sales in California and certain sales in Nevada, no evidence was introduced as to the extent of business done in other states during this period. The district court found that any business which the McCaffertys had established or may have established outside the state of California, Nevada, Oregon, Washington, Utah, Colorado, and Hawaii was fully and completely abandoned after 1955. Further, the lower court found that notwithstanding mail orders from states other than those listed above, any semblance of an established business by the McCaffertys outside those states ceased to exist shortly after it was first created.[3] During the entire time in which they were manufacturing and marketing Sheila Shine polish, the McCaffertys' advertising was limited to a 1946 Long Beach yellow pages telephone listing and 1954 Daymar Publications catalogue listing. The latter did not list the polish by name. There was never any other telephone listing by name of the McCafferty business prior to the incorporation of SS California in 1967.
 
 
 10
 In 1965, Daniel McCafferty died intestate. His share of the polish business passed to his wife Helen under California's community property laws. Also in 1965, the McCaffertys discovered that SS Florida had established and was conducting a nationwide business in the sale of Sheila Shine polish. Shortly after Daniel McCafferty's death, all the mixing and manufacturing equipment at the Verdi, Nevada, location was sold or discarded; no further polish was mixed until Berryman Products, Inc. began production for SS California in late 1967 or early 1968.
 
 
 11
 In June of 1967 the plaintiff corporation (SS California) was organized. In exchange for 300 shares of its stock, Helen McCafferty conveyed to SS California cash, certain items of office equipment, and her interest in the trade name and business of Sheila Shine Polish. From the incorporation in June 1967 until the end of 1967 sales were less than $500.00. Gross sales for the fiscal year ending June 30, 1968, were less than $5,000.00; and gross sales for the fiscal year ending June 30, 1969, were under $25,000.00, of which over $18,000.00 in sales were to customers previously doing business with the defendant, SS Florida.
 
 
 12
 Beginning in 1955, and following the disputed transaction of January 11 of that year, Pan American began a gradual plan of expanding its sales of Sheila Shine polish under the name Sheila Shine throughout the state of Florida and into neighboring states as well. Initially Sheila Shine was just one of hundreds of items which Pan American marketed. Beginning in 1959 when sales of Sheila Shine polish began to rise noticeably, William S. Wallach began to segregate invoices reflecting sales of Sheila Shine. By early 1962, sales had grown to the extent that the owners of Pan American decided to organize a separate corporation exclusively for the manufacture and sale of Sheila Shine polish. SS Florida was incorporated in March of 1962. The lower court found as a fact that
 
 
 13
 "[n]otwithstanding the finding of the jury and the finding of the court to the effect that there was no sale in January 1955 of the entire business of the McCaffertys to Pan American, the owners of Pan American in good faith believed that they had acquired such business and began and continued the expansion of the sale of Sheila Shine polish to other states in the bona fide belief that they had a right to do so as the owners of the product and the name."
 
 
 14
 Between 1955 and 1969 Pan American and its successor SS Florida gradually expanded sales of Sheila Shine polish throughout most of the United States, and into foreign markets as well. From the incorporation of SS Florida until 1970, SS Florida's gross sales of Sheila Shine polish continued to grow as a result of vigorous sales and advertising policies.[4]
 
 
 15
 In 1961, Pan American obtained the approval of the General Services Administration (GSA), a government agency which administers the janitorial services of the United States government, for sales of Sheila Shine to the United States. Thereafter Pan American and its successor SS Florida made substantial sales of Sheila Shine polish to the GSA on a continuing basis, the polish being listed under the name Sheila Shine in official GSA catalogs. The Sheila Shine polish sold by SS Florida to GSA is warehoused by GSA for its own use and is not resold to the public.
 
 
 16
 SS Florida registered the trademark "Sheila Shine" in the state of Florida in 1966, and the same year filed an application for a federal trademark registration of the name and mark. The federal trademark registration was approved in 1967 after the required notices were published. Neither SS California nor the McCaffertys ever registered or sought to register any mark, federal or state.
 
 
 17
 In 1959, Pan American designed an entirely new label and trademark bearing the name Sheila Shine without the picture of the McCaffertys' daughter Sheila. The 1959 label and mark have been used continuously by SS Florida since its incorporation. The lower court found and we agree that no resemblance existed between the label and mark used since 1959 by SS Florida and the label formerly used by the McCaffertys. For a short time Pan American used some of the labels furnished by the McCaffertys' in 1955, but soon thereafter began use of a different label bearing no resemblance to the McCafferty Sheila Shine label.
 
 
 18
 The McCaffertys continued to use their original or a similar label until late 1967, after incorporation of SS California. SS California then designed and began to use on its containers a label substantially identical to that used by SS Florida. The district court found that "[a] visual inspection of the new label used by the plaintiff [SS California] and that used since 1959 by the de fendants [SS Florida] clearly indicates a virtual duplicate of the label designed by the defendants."
 
 
 19
 The parties stipulated that confusion existed, in the legal sense, as to the origin of the respective products of SS California and SS Florida. The lower court stated that there was an "abundance of actual evidence in the record" to support a finding that confusion had arisen since SS California began use of its new-the so-called red-label in late 1967 or early 1968. The court found, however, that prior to SS California's use of the red label no confusion existed because there had never been any contact between SS Florida and any of SS California's customers before that time.
 
 
 20
 Based upon its findings outlined above the district court proceeded to make conclusions of law. It concluded that irrespective of registration, the existence of a trademark within a given territory depends upon its use in connection with an established business; SS Florida, by reason of the use of the name Sheila Shine in connection with its established business throughout most of the United States, was entitled to register the name Sheila Shine under the patent laws of the United States; and that both the federal and Florida registrations were valid registrations of the mark. Having found that SS California and its predecessors were the first to use the name and mark Sheila Shine in connection with an established business in the states of California, Nevada, Oregon, Washington, Utah, Colorado and Hawaii, the district court concluded that SS California was entitled to an injunction restraining SS Florida from the use of the name and mark Sheila Shine in those states. Based upon its findings of fact, the court also concluded that there had been insufficient use either by SS California or by SS Florida in the states of South Dakota and Wyoming to determine that either was the first user of the name and mark in connection with an established business in those states. Determining that SS Florida and its predecessors were the first users of the name and mark Sheila Shine in connection with an established business in the remaining states of the union, the court concluded that SS Florida was entitled to an injunction restraining SS California's use of the mark and name in those states. Because of the territorial separation, each party was given the right to the exclusive use of the name Sheila Shine within the territory awarded to it. Finally, in view of the jury's verdict the court concluded that no award of damages in favor of either party was appropriate. Final judgment and permanent injunction in accordance with the findings of fact and conclusions of law was entered.
 
 
 21
 The court ordered that SS Florida be permitted to continue selling polish under the name Sheila Shine and in the present label to GSA within the areas allotted to SS California, provided that such products were not resold to the general public. Each party was charged with the responsibility of controlling the distribution of its products bearing the name Sheila Shine so as to ensure that the products would not, by reshipment, resale, or any other manner, be sold or distributed in the areas allotted to the other party. Jurisdiction was retained for enforcement of the decree with a special provision requiring either party desiring to sell in a territory awarded to the opposing party to make application to the court with notice to the opposing party thirty (30) days prior to such use.[5]
 
 The Role of the Jury
 
 22
 SS California's contentions that the findings of fact and conclusions of law entered by the district judge are at odds with the verdict of the jury in favor of SS California, Note 1, supra, are based upon a fundamental misconception of the proper role of a jury in litigation. The right of trial by jury does not extend to cases historically cognizable in equity. Rule 38(a), F.R.Civ.P.; Katchen v. Landy, 1966, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391. SS California's action for injunctive relief relating to trademark infringement and unfair competition was equitable in nature. Coca-Cola Co. v. Wright, W.D. Tenn.1971, 55 F.R.D. 11; Kimberly-Clark Corp. v. Kleenize Corp., N.D.Ga. 1961, 194 F.Supp. 876; Davies v. Allied Industrial Products, N.D.Ill.1951, 100 F.Supp. 109; 5 Moore's Federal Practice 207. So long as a party is granted a jury trial on issues properly triable by jury it may not complain that equitable issues were disposed of by the trial court. Katchen v. Landy, supra; Dairy Queen, Inc. v. Wood, 1962, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44.
 
 
 23
 As the jury awarded no damages against either party, and the trial court found that no damages were appropriate, and moreover since neither party complains here of the resolution of the damage issue below, we are not required to choose between the decision of the jury or that of the trial court as finally dispositive of the damage issue. The only questions raised on appeal and cross-appeal concern issues historically equitable in nature, matters for court, not jury disposition.
 
 
 24
 F.R.Civ.P. 39(c) permits a district court in its discretion, In Re Pan American Life Ins. Co., 5 Cir. 1951, 188 F.2d 833, to submit issues of fact in an equity matter to an advisory jury. The trial court may, however, submit only such issues of fact as it sees fit. It is not bound by the findings of the advisory jury, which it is free to adopt in whole or in part or to totally disregard. Aetna Ins. Co. v. Paddock, 5 Cir. 1962, 301 F.2d 807. The Paddock court's statement as to the proper weight to be accorded to an advisory jury's findings applies here:
 
 
 25
 Thus, the appeal here, other than questions going to damages which were considered by the jury in its regular capacity as distinguished from advisory capacity, must be and is from the findings of fact of the court. 301 F.2d at 811.
 
 
 26
 Hence our concern with the trial court's findings is not whether they dovetail perfectly with the jury verdict. We are concerned rather with whether those findings pass muster under the "clearly erroneous" standard of F.R.Civ.P. 52(a), which governs appellate review of trademark cases. Aloe Creme Laboratories, Inc. v. Milsan, 5 Cir. 1970, 423 F.2d 845, 850, cert. denied, 398 U.S. 928, 90 S.Ct. 1818, 26 L.Ed.2d 90; Turner v. HMH Publishing Co., 5 Cir. 1967, 380 F.2d 224, cert. denied, 389 U.S. 1006, 88 S.Ct. 566, 19 L.Ed.2d 601; Nat'l Ass'n of Blue Shield Plans v. United Bankers Life Ins., 5 Cir. 1966, 362 F.2d 374.
 
 Issues on Appeal
 
 27
 Appellant SS Florida questions several determinations made by the district court. Cross-appellant SS California resists these contentions and raises issues of its own. Of course the conflicting claims of the parties do not fall into perfectly parallel sequence, but we believe that the following discussion will suffice to dispose of each of them.
 
 SS California as an Established Business
 
 28
 SS Florida urges that as a matter of law, SS California's predecessors, the McCaffertys, never had an established business sufficient to give them rights to the mark Sheila Shine. As SS Florida points out and as recognized by the trial court, a trademark is not a right in gross or at large. A trademark instead is part of the accumulated goodwill of an established business, and the right to a particular mark derives from its use in connection with an established business or trade. United Drug Co. v. Theodore Rectanus Co., 1918, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141; Hanover Star Milling Co. v. Metcalf, 1916, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713. In order to have acquired rights in the appurtenant trademark Sheila Shine then, the McCaffertys must have had an established business in the manufacture and sale of the polish.
 
 
 29
 The district court found that the McCaffertys manufactured and sold polish from 1945 to 1955. Although such sales were door to door, the evidence is persuasive that the manufacturing and selling efforts were reasonably continuous over the decade 1945 to 1955. The disputed January 1955 transaction between the McCaffertys and Pan American indicates that Pan American dealt with the McCaffertys as an established business.
 
 
 30
 Mindful of the caveat "that each trademark case must be decided upon its own facts . . ." American Foods, Inc. v. Golden Flake, Inc., 5 Cir. 1963, 312 F.2d 619, 627, we conclude that that business was sufficiently established to support an appurtenant right to the mark Sheila Shine. While the use of a mark "may be so transitory, spasmodic, and inconsiderable as not to vest title in the user . . . .", Worden v. Cannaliato, 1923, 52 App.D.C. 254, 285 F. 988, 990, continuous use of a mark over a substantial period of time will create a property right in that mark; cf. McGehee v. O.K. Storage and Transfer Co., 5 Cir. 1964, 330 F.2d 703. The mere fact that a business is small and its trade modest does not necessarily militate against its being an established business capable of acquiring goodwill and rights in a trademark. Cf. France Milling Co. v. Washburn-Crosby Co., 2 Cir. 1925, 7 F.2d 304.
 
 The Disputed January 1955 Transaction
 
 31
 It was SS Florida's contention below, adhered to before us, that the only permissible inference from the testimony is that the McCaffertys sold all rights in the Sheila Shine polish business to Pan American in January, 1955. However, Helen McCafferty testified that the payment of $150 made at that time by Pan American was for three drums of polish and not for purchase of the Sheila Shine business. The court was called upon to make a credibility resolution as the trier of fact between the conflicting testimony of Helen McCafferty and that of the SS Florida witnesses. In view of the supportive testimony of Helen, we are in no position to set aside the finding of no sale as clearly erroneous, F.R.Civ.P. Rule 52(a).
 
 Rights to the Sheila Shine Mark after 1955
 
 32
 Appellant SS Florida asserts that SS California is estopped from challenging its marketing rights in the states that the district court awarded to SS California, and later argues that SS California had in fact abandoned those states. The interrelationship of the legal theories of estoppel and abandonment makes their discussion together helpful.
 
 
 33
 SS Florida urges that because of a lack of supervision, direction, and control by the McCaffertys over SS Florida's use of the name Sheila Shine, SS California is estopped to challenge SS Florida's use of the mark and the business developed by such use. The trial court found that the disputed 1955 transaction constituted at least "the exclusive right to manufacture and sell the polish in the State of Florida", and Helen McCafferty's position was that it constituted the reappointment of Pan American as the Florida distributor of the polish. There is thus no question but that the 1955 transaction at the least constituted a license from the McCaffertys to Pan American to market the polish in Florida. It was also undisputed, as the trial court found, that from February 1955 until May 1966 there was no communication whatever between the McCaffertys and Pan American and that "[t]here was no direction or supervision of any kind by the McCaffertys over the activities of Pan American, nor was any such direction or supervision ever attempted during such period or, in fact, at any time thereafter".
 
 
 34
 The owner of a trademark has not only a right to license the use of his trademark to others, but also a concurrent duty to exercise control and supervision over the licensee's use of the mark. Denison Mattress Factory v. Spring-Air Co., 5 Cir. 1962, 308 F.2d 403, 409. Cf. Kidd v. Johnson, 1879, 100 U.S. 617, 25 L.Ed. 769. Failure to exercise such control and supervision for a significant period of time may estop the trademark owner from challenging the use of the mark and business which the licensee has developed during the period of such unsupervised use. Denison Mattress Factory v. Spring-Air Co., supra. This principle is an analogue to the estoppel against a trademark owner who knowingly sits silently by while infringers use his trademark over a significant period of time. Saxlehner v. Eisner & Mendelson Co., 1900, 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60; Dwinell-Wright Co. v. White House Milk Co., 2 Cir. 1943, 132 F.2d 822. The undisputed failure by the McCaffertys to exercise any supervision or control over the activities of Pan American or its successor SS Florida leads us to hold that SS California is estopped to challenge the business which SS Florida has built up under the mark Sheila Shine. As we develop, infra, however, this estoppel precludes challenge only in the trade area awarded to SS Florida.
 
 
 35
 The lower court also found that the McCaffertys abandoned any established business in Sheila Shine polish outside the states of California, Nevada, Oregon, Washington, Utah, Colorado, and Hawaii shortly after the January, 1955 transaction. SS California correctly contends that mere non-use for a period of time is insufficient to constitute abandonment of a mark. Beech-Nut Packing Co. v. P. Lorillard Co., 1927, 273 U.S. 629, 47 S.Ct. 481, 71 L.Ed. 810. Rather, an intent to abandon the mark must also be evident. Baglin v. Cusenier Co., 1911, 221 U.S. 580, 598, 31 S.Ct. 669, 674, 55 L.Ed. 863, 871. In this case SS California made no direct sales other than in California, Nevada, Oregon, Washington, Utah, Colorado or Hawaii after the year 1955. There were sporadic and occasional mail order sales in other states, but these were insufficient to constitute an established business outside the area set forth above. Worden v. Cannaliato, supra. In addition, the lower court found that the distribution points which the McCaffertys had established prior to 1955 in Chicago, Newark, Miami, and Houston were abandoned in a short time.
 
 
 36
 The actual cessation of an established business plus an intent to abandon it is sufficient to constitute abandonment and concomitant loss of rights in a trademark. Saxlehner v. Eisner & Mendelson Co., supra. Intention to abandon a trademark may be inferred from the facts surrounding physical abandonment. Baglin v. Cusenier Co., supra, 221 U.S. at 598, 31 S.Ct. at 674, 55 L.Ed. at 871. Since a state is an appropriate territory by which to define trade areas when two parties are competing over the right to use the same mark, United Drug Co. v. Theodore Rectanus Co., supra, we deem it consistent with general principles of trademark law to hold that a user may abandon a trademark in certain states without abandoning it in others. The evidence demonstrated actual abandonment in the trade area not awarded to SS California, and we conclude that the evidence, taking into consideration both the actual cessation of business and the length of time involved, was sufficient to permit the trier of fact to infer the requisite intent to abandon the mark by the McCaffertys in the above mentioned states.
 
 
 37
 As a junior user in good faith, SS Florida is entitled to utilize the mark in connection with its established business in those areas in which the McCaffertys abandoned the mark after 1955. In addition, SS California, because of the lack of supervision and control by the McCaffertys over SS Florida and Pan American, is estopped to deny to SS Florida the right to the business developed by it in most of the states of the country. Concomitantly we sustain the finding of the district court that SS California did not abandon the mark in the states of California, Oregon, Nevada, Washington, Utah, Colorado, and Hawaii.
 
 
 38
 We agree also with the district court that SS California is not estopped from denying the right of SS Florida to trade under the name Sheila Shine in the aforementioned seven far western states. The findings of the lower court indicate that Pan American first entered the seven state trade area of SS California in 1960 by making sales in the state of Oregon. In 1962, Pan American made its first sales in the state of Colorado. In its first fiscal year beginning December 1, 1962, Pan American's successor SS Florida made direct sales in all of the states within the trade area of SS California, with the exception of Nevada. SS Florida did not enter Nevada until its fiscal year beginning December 1, 1965. The record shows that Helen McCafferty and her son Robert Belt journeyed to Miami in May, 1966. They informed the officers of SS Florida at that time that they considered the business activities of SS Florida to be an infringement of the rights of Helen McCafferty in the mark Sheila Shine. This trip to Miami was an effort to exercise control and supervision within the dictates of Denison Mattress Factory v. Spring-Air Co., supra. There was thus a delay of approximately six years between the first entry of Pan American into SS California's trade area until Helen McCafferty's attempt to exercise some form of control over SS Florida. But the delay was only four years from Pan American's entry into Colorado, and only about three years from the entry of SS Florida into the major portions of SS California's trade area.
 
 
 39
 We approve as correct the district court's conclusion that the McCaffertys abandoned the mark Sheila Shine in all states outside their seven state trade area in 1955 or shortly thereafter. Since they had abandoned the mark outside that area, the McCaffertys were under no legal duty to exercise supervision or control over the activities of Pan American and its successor SS Florida in the area where the mark had been abandoned. Such supervision would have been inconsistent with the lower court's finding of abandonment. Instead, the duty to supervise and control arose only when SS Florida or its predecessor attempted to enter the trade area which the McCaffertys had not abandoned in 1955, and in which they were continuing to conduct an established business. In Denison Mattress Factory v. Spring-Air Co., supra, we said, "If the [owner] of a trademark allows or persists in allowing others to misuse his rights, he may, after an appropriate time, find that he has lost his rights through constructive abandonment." 308 F.2d at 409 (emphasis added). Similarly, a trademark owner has an appropriate time, or grace period, for the exercise of control over a licensee's use of a mark. Of necessity, this period varies according to the peculiar facts of each individual case. Cf. American Foods, Inc. v. Golden Flake, Inc., supra. Given the facts present, that the McCaffertys had abandoned the mark outside of their seven state trading area, that SS Florida's license was exclusive within an area which the McCaffertys had abandoned, and that the McCaffertys did not discover SS Florida's business until 1965, we will not hold that the six year delay between SS Florida's entry into the McCafferty's trade area and Helen McCafferty's attempt to exercise control was sufficient to constitute estoppel as to those states within the McCafferty's trade area. On this basis we agree with the district court that SS California's estoppel to deny SS Florida's use of the mark and the business appurtenant thereto extends only to those states which SS California abandoned after 1955.
 
 
 40
 To summarize, we hold that the district court did not err in awarding to SS Florida those states which SS California had abandoned and in which SS Florida had developed an established business; further, the court did not err in awarding to SS California those states which SS California, as first user, had not abandoned and in which SS California had continued to conduct an established business. As a trademark may enjoy protection in a given territory only as an appurtenance to an established business, United Drug Co. v. Theodore Rectanus Co., supra; Hanover Star Milling Co. v. Metcalf, supra, we also conclude that the lower court's failure to award the states of South Dakota and Wyoming to either SS California or SS Florida was not error; neither company had developed trade in those states sufficient to constitute an established business. Lastly, the market which SS Florida developed connection with sales to the GSA is a specific trade area sufficiently analogous to a geographical region to sustain its award to SS Florida.
 
 
 41
 Limits on SS California's Use of the Trademark
 
 
 42
 SS Florida also urges us to modify the district court's injunctive order. Basically the cross-appellant argues that since SS California's polish business was almost exclusively of a local retail character, its marketing rights in California should be confined to retail customers in the Los Angeles and San Francisco areas. By inference this means that SS California would be deprived of the rights in the remaining far western states allotted to it by the lower court. This theory is based on what SS Florida conceives to be "fairness and equity," and also upon a line of cases dealing with defenses to actions for unfair competition. These cases hold essentially that, "there can be no unfair competition where there is in fact no competition at all." SS Florida asserts that since there was no overlap in either the distribution of its wholesale and SS California's retail trade, nor in SS Florida's state-wide sales and SS California's local sales, SS Florida is entitled to continue such activities. We are unpersuaded.
 
 
 43
 Looking first at the wholesaleretail distinction, it is not clear from the record that SS California was doing exclusively retail selling from 1955 to 1966. The district court found that four companies purchased from the McCaffertys on a wholesale basis during that time, and it had previously been their common practice to sell to individual salesmen who would in turn retail the polish to commercial customers. But even assuming that the business was one of a substantially retail nature, appellant's suggestion that it be confined to such in the future is untenable. The only authority for the retail-wholesale distinction cited by appellant[6] is inapposite to the case at bar. Cases drawing such a distinction do so only when one party is exclusively a retailer and the other is exclusively a wholesaler, neither having the facilities or the desire to enter the province of the other. 148 A.L.R. 52 n. 202 (1944). Both parties here have amply demonstrated, as sales figures since 1968 reflect, a capacity for operating a successful wholesale business. Nor does SS Florida tell us how it could ensure that the polish it sold wholesale to distributors in California would not ultimately come into direct competition with the product of SS California at the retail level. Henry W. Fishel & Sons v. Distinctive Jewelry Co., 1921, 196 App.Div. 779, 188 N.Y.S. 633. The more recent and, we believe, better reasoned authority on this subject rejects such a distinction whenever there is any possibility that identical goods may reach the same market. See, for example, 87 C.J.S. "Trademarks, Etc." Sec. 88, N. 28 and cases cited.
 
 
 44
 The other aspect of SS Florida's request suggests a geographic limitation upon permissible marketing areas. Again we are faced with the problem that the evidence fails to establish that SS California sold only in the locales of Los Angeles and San Francisco. Especially is this true in light of the fact that SS California did sell to at least four companies on a wholesale basis, which in turn may well have distributed the polish throughout their states. It seems that appellant is saying that, given the limited quantity of SS California's sales, we should assume that it was limited to local distribution. We should not substitute our judgment, even if it were different, for that of the district court on this point. Furthermore, to so limit SS California would entirely ignore the doctrine of "right of expansion" in connection with the territorial scope of trademarks. 148 A.L.R. 72 (1944); 87 C.J.S. Trade-Marks, Sec. 7d. In Socony-Vacuum Oil v. Oil City Refiners, 6 Cir. 1943, 136 F.2d 470, it was held that the use of a mark in one part of a state extends its territorial priority to the entire state. The Florida cases to the contrary cited by appellant are not apposite here since they deal with the trade name of a retail store. Two stores situated across the state from each other hardly present a factual analogy upon which to analyze the competition between indistinguishable products which circulate throughout a state. In keeping with the holding of Socony Vacuum Oil, supra, and the judgment of the district court as to what is fair and equitable in this case, we reject appellant's request for a modification of the injunction.
 
 
 45
 SS California's Use of SS Florida's Registered Mark
 
 
 46
 As its last specification of error, SS Florida asserts that even if the seven western states were properly awarded to SS California, the use of its federally registered trademark by SS California should be enjoined. Failure to do so, in appellant's words, "contravenes the whole purpose of the Lanham Act." SS Florida cites no authority in support of the purported contravention and we have found none. The Lanham Act, Title 15 U.S.C. Secs. 1051 et seq., contains not even a hint of the existence of a policy of protecting registered marks from infringement in areas where the registrant is not entitled to do business. The law on this subject appears to us to be uniformly contrary to appellant's position. Registration does not affect any of a party's substantive common law trademark rights. "Under the Lanham Act . . . registration of a trademark confers only procedural advantages and does not enlarge the registrant's rights, for ownership of the trademark rests on adoption and use, not on registration." Turner v. HMH Publishing Co., 5 Cir. 1967, 380 F.2d 224, 228.
 
 
 47
 The question therefore of SS Florida's rights to use of the registered trademark is covered by our discussion earlier in this opinion explicating the common law rights of the litigants. We have there noted that SS California had not abandoned the seven western states which the district court awarded to it, and also that it had not failed properly to object to the presence of SS Florida in that area, thereby fulfilling its duty to exercise supervision and control. SS Florida's protection equally under the common law and the Lanham Act being geographically coterminous with the area where the trial court granted it permission to use the trademark, its claim of error is in this respect without substance.
 
 
 48
 Our study of both appellant's and cross-appellant's specifications of error in conjunction with the relevant facts as disclosed by the record convinces us that error is not demonstrated by either the appeal or the cross-appeal in No. 71-3407.
 
 The Post-Judgment Appeal-No. 72-1294
 
 49
 The district court's final judgment was entered April 12, 1971. Paragraph four of that judgment provided:
 
 
 50
 That until and unless otherwise provided by the Court, each party to this cause will furnish to the Court and to each opposing party at least 30 days prior to any use thereof in business, a copy of any name, mark or label which said party proposes, or might propose, to use in connection with sales in any territory herein allocated to such opposing party for the exclusive use of the name "Sheila Shine."
 
 
 51
 The lower court found SS California to be in violation of this portion of the judgment, and SS California has appealed that determination. The appeal, No. 72-1294, was consolidated with the main case, No. 71-3407. The appeals were argued together.
 
 
 52
 The record reveals that SS California made at least seven or eight sales of polish in states allotted to SS Florida under a new label within four months of the final judgment, with resulting revenues of at least $3600.00 from these sales. At no relevant time had the new label been approved by the district court for use outside SS California's seven state trade area. This new label was dissimilar to the one registered by SS Florida and adopted by SS California in 1967 in the following respects: (i) the color was changed from blue to red; (ii) the original picture of a young girl was restored; (iii) beneath the picture the words "Sheila's Shine Products Inc." appeared; and (iv) the product name was changed to read "Original Shine". There is inconclusive evidence that SS California sent a copy of this new label, together with a request for permission to use it nationwide, to the district court. Prior to a hearing fixed for consideration of alleged violations of the injunctive provisions of the final judgment, however, counsel for SS California failed to file a motion for approval of the new label and it never received the approval of the court.
 
 
 53
 Made aware of SS California's use of the newly labeled polish in marketing areas reserved to SS Florida under the final judgment, the latter company filed below a "Motion to Impose Sanctions, for Instructions and to Dismiss Cross-Appeal". SS California countered with a "Motion to Approve and to Ratify Plaintiff's New Label Design." By order of October 6, 1971, the lower court: (i) denied Plaintiff's Motion to Approve its new label; (ii) granted SS Florida 30 days in which to conduct discovery for the purpose of determining the extent of SS California's violation of the final judgment; and (iii) ordered SS California to cease and desist from the sale of any polish in any territories set aside for SS Florida in the final judgment. On November 23, 1971, after a hearing on the matter, the court granted Defendant's Motion for Further Sanctions and ordered, inter alia, that SS California pay to SS Florida $1,753.97 in damages and attorney's fees of $250.00 within 30 days. On March 3, 1972, the court entered an order dealing with yet another unapproved label used by SS California (not relevant to this appeal), and repeated its requirement that SS California "cease and desist forthwith from causing to be marketed in those territories set aside for the Defendant corporation any polish or product under any label until such time as said label is brought before this Court for approval." The injunctive features of this March 3, 1972 order and the earlier November 23, 1971 order are the subject of the appeal in No. 72-1294.
 
 
 54
 The post judgment orders of the district court in this case present two issues for examination. First, was paragraph four of the final judgment violated by SS California, as the court found? Second, if such a violation occurred, did the district court abuse its discretion by the sanctions it imposed?
 
 Violation of the Final Judgment
 
 55
 Paragraph four, supra, enjoined either party from distributing polish in the geographic area awarded to the other party absent submission to the court of any label proposed to be used. SS California supports its position that no violation of the injunctive feature of the decree took place by two arguments.
 
 
 56
 It first urges that the injunction was overly broad and general, contrary to F.R.Civ.P. Rule 65(d), and thereby failed to put SS California on notice as to the conduct proscribed. Rule 65(d) provides, in pertinent part, that:
 
 
 57
 Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; . . .
 
 
 58
 The clear purpose of this language is avoidance of injunctions which do not set out fairly for the benefit of the enjoined party what conduct is forbidden. An injunction is overly broad which leaves parties "open to the hazard of conducting business in the mistaken belief that it is not prohibited by the injunction and later finding themselves subject to punishment for contempt." B & C Truck Leasing, Inc. v. I. C. C., 10 Cir. 1960, 283 F.2d 163, 167. "It is, of course well accepted that an injunction must be worded in such specific terms and with such detail as to put the party enjoined on notice of precisely what he is called upon to do or refrain from doing." Williams v. United States, 10 Cir. 1967, 402 F.2d 47, 48.
 
 
 59
 On the basis of these and similar statements SS California argues that Paragraph Four was overly broad in failing to indicate that a proposed new label must be both submitted and approved before use in territory allocated to the other party. We disagree. While the injunctive order did not specify in terms that proposed labels be furnished "for approval", there could be no other reason for requiring submission to the court. The whole dispute in the main litigation involved the use of identical marks, and the opportunity to pass upon a label before use was the self-evident purpose of retaining jurisdiction. SS California fails to advance any other plausible explanation for requiring submission to the court and to the other party than an opportunity for a court hearing and approval before use of the proposed label. The court's examination of the new label would be a futile exercise if not followed by a determination of the right vel non of the submitting party to use it in territory previously allotted to the opposing party. It was patent from the injunction's reference to "mark or label which said party proposes, or might propose, to use . . . " that any label for use in an area not awarded could only be proposed until the court by appropriate order authorized its use. A contrary interpretation would leave SS California free to use a slight variation upon the SS Florida label in nationwide marketing until SS Florida could relitigate the entire issue. The injunctive order was not overly broad or vague since court approval was necessarily and unmistakably implicit in the required submission of proposed documents to the court.
 
 
 60
 SS California advances an additional argument for reversal of the findings of contempt. Assuming that the injunctive order required court approval, it is urged as a matter of law that the new label used by SS California in SS Florida's territory was due to be approved. Hence the appellant was erroneously penalized for marketing under a label that the trial court by law had no choice but to approve.
 
 
 61
 This will not do. First, the sanctions imposed below were for a violation of the court order banning distribution without submission, which we hold supra, included approval, and not for marketing under a confusing label. SS California violated the injunctive order, without regard to the lack of similarity of its new label to the SS Florida label. But even if this is not so, we are bound by the lower court's determination of similarity (upon which it grounded the denial of appellant's motion to approve) unless it was clearly erroneous, Rule 52(a), F.R.Civ.P. Comparison of the two labels persuades us to approve, not to disapprove, the findings below in this respect. While the brand name was changed and the little girl's picture was added, the general format remained the same. "Sheila's Shine Products, Inc." appeared in the lower front center of the label. It appears probable that a consumer would be at a loss to determine whether this was "Sheila Shine" marketed under a new name ("Original Shine") or was an entirely distinct product being produced by a company that happened to be named "Sheila's Shine Products, Inc." The requisite "clearly erroneous" showing is not made.
 
 
 62
 The Sanctions-Abuse of Discretion?
 
 
 63
 SS California urges that even if it was correctly found to be in technical violation of the court's judgment and injunctive order of April 12, 1971, still the order of October 6, 1971, imposing sanctions for said violation was unlawfully broad. This contention is rested upon the proposition that a decree may not go beyond the issues raised by the pleadings. Star Bedding Co. v. Englander Co., 8 Cir. 1957, 239 F.2d 537. It is argued that the court could not lawfully in a trademark infringement case, as it sought to do by its October 6, 1971 order, require one of the parties (SS California) to "forthwith cease and desist and terminate any sale of any polish in any of the territories set aside for the Defendant [SS Florida] in the final judgment dated the 12th day of April, 1971" (emphasis supplied). We find it unnecessary to determine whether that provision in fact enlarged the judgment beyond the scope of the pleadings in the case. It is sufficient to note that on March 31, 1972, in response to SS Florida's Motion (for Sanctions, to Enter Judgment and to Compel Discovery), the court entered a new order which in paragraph five provided that, "Plaintiff is ordered to cease and desist forthwith from causing to be marketed in those territories set aside for the Defendant corporation any polish or product under any label until such time as said label is brought before this Court for approval" (emphasis supplied).
 
 
 64
 The October 6, 1971, order about which SS California complains perhaps should be construed impliedly to mean "until a new label is submitted and approved." But in view of the superseding order of March 31, supra, the point is now moot. We need not decide the question.
 
 
 65
 We deal briefly with a final point as to the district court's discretion raised by SS California at oral argument, though the point was not briefed by the parties. The award of $2,003.97 to SS Florida for discovery expenses is attacked for including unauthorized exceptional expenses such as travel and attorney fees. While reserving ruling on damages in its first post-judgment order, October 6, 1971, the trial court granted SS Florida's Motion to Impose Sanctions, and allowed SS Florida to proceed with discovery as to violations. The court awarded the $2,003.97 by the second post-judgment order, November 23, 1971, after SS Florida submitted its proof of expenses incurred in discovery.
 
 
 66
 The argument goes that while Rule 37, F.R.Civ.P., authorizes a court to award travel and legal costs, the rule permits such an award only in connection with an order "compelling an answer" to discovery, and that the October 6 order merely authorized discovery and did not compel it; hence Rule 37 did not justify the award of extraordinary expenses by the November 23, 1971 order. Finally, if Rule 37 does not apply, then the court could act only under the general Taxation of Costs statute, Title 28 U.S.C. Sec. 1920. Of course Sec. 1920 does not authorize assessment of travel or legal expenses. SS California computes SS Florida's allowable expenses under the statute at $228.95, and claims therefore that the award was in error by $1,775.02.
 
 
 67
 SS California's argument is fallacious because it fails to correctly identify the basis for the November 23, 1971 order. It was not entered in misplaced reliance upon F.R.Civ.P. 37. Rather, it was entered specifically pursuant to the October 6, 1971 order holding SS California in contempt of the Final Judgment of April 12, 1971, and granting SS Florida's Motion to Impose Sanctions. Nor does Title 28 U.S.C. Sec. 1920 apply, as it deals only with costs taxed pursuant to a final judgment.
 
 
 68
 The expenses assessed here were assessed pursuant to the court's finding that SS California was in contempt of its final injunctive order. This brought into play the court's "power to punish by fine or imprisonment, at its discretion, such contempt of its authority, * * * as * * * (3) disobedience or resistance to its lawful writ, process, order, rule, decree, or command." Title 18 U.S.C. Sec. 401. In view of a federal court's wide power under that section to impose fines for disobedience to its orders, we find no abuse of discretion in the court's ordering SS California to pay the costs of the appellee's discovery of the extent of SS California's violations of the court's order.
 
 Conclusion
 
 69
 Careful review of the record in both No. 71-3407 and No. 72-1294 in the light of the conflicting contentions of the parties has not convinced us that harmful error is present.
 
 
 70
 Affirmed.
 
 
 
 [1]
 The verdict was in the following form: "We the jury find for the plaintiff Sheila's Shine Products, a California corporation, and assess compensatory damages in no amount and punitive damages in no amount against defendant Pan American Chemical Company . . . Sheila Shine, Inc., a Florida corporation . . . William Wallach . . . Philip Wallach . . . [and] Don Solomon . . . ". Trial Record at 3138-39
 Pan American Chemical Company is not involved as a party in the instant appeal or the cross-appeal, nor is Don Solomon.
 
 
 [2]
 The trial court deemed this finding of fact consistent with the verdict of the jury in favor of SS California, in that the jury had by implication found that there was not an absolute sale of the McCafferty's business to Pan American
 
 
 [3]
 The McCaffertys' business records consisted primarily of sales ticket books. Helen McCafferty testified that some records were lost in a flooded basement in 1963 and that others were discarded after Daniel McCafferty's death in 1965. As found by the district judge, a summary of the ticket books introduced into evidence indicated the following volume of sales from 1956 until 1968:
 TAKEN FROM CALIFORNIA SALES TICKETS COMPOSITE EXHIBIT 431
 YEAR NO. SALES TOTAL
 1956 35 $ 644.12
 1957 25 721.50
 1958 395 3,820.90
 1959 885 5,432.01
 1960 188 2,461.50
 1961 45 1,352.70
 1962 82 2,095.60
 1963 10 321.20
 1964 24 574.87
 1965 21 717.98
 1966 19 784.24
 1967 14 551.94
 1968 13 500.70
-------------------------------------------------------------
 13 years 1756 $19,979.26
 
 
 [4]
 Following is the district court's summary gross sales made by SS Florida for the period 1962 through 1970, together with expenditures for advertising:
 PERIOD ENDING GROSS SALES ADVERTISING COSTS
11/30/62 (8 mos.) $ 36,903.71 $ 1,734.26
11/30/63 58,362.35 1,411.95
11/30/64 111,906.12 7,426.98
11/30/65 145,003.00 8,463.64
11/30/66 211,565.73 9,965.21
11/30/67 228,727.40 5,884.81
11/30/68 234,587.15 10,417.45
11/30/69 275,783.87 10,420.94
10/31/70 (11 mos.) 309,968.95 8,975.22
 
 
 [5]
 The effect of this last provision of the district court's order is involved in the appeal in the companion case, No. 72-1294, and will be discussed infra
 
 
 [6]
 Appellant is perhaps being facetious in stating that it will not elaborate unduly because of the present clarity in the law-we find the law in this area neither extensive nor clear. See the A.L.R. note cited in the text: 148 A.L.R. 52 n. 202 (1944)